Larry FOX, Jackie Noe, Paul Albright, Nancy Stanton, Victor Poulsen, Anne Woshlo, and Marie Clemente, Plaintiffs,

v.

MASSEY-FERGUSON, INC., Defendant,

v.

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), Third Party Defendant.

No. 93-CV-74615-DT.

United States District Court,
E.D. Michigan,
Southern Division.

May 31, 1995.

---

## ORDER

COOK, Chief Judge.

In 1993, Varity Corporation (Varity) unilaterally modified a retirement health program that had been established for the benefit of its employees through the collective bargaining process prior to its acquisition of the Defendant/Third Party Plaintiff, Massey–Ferguson, Inc. (Massey–Ferguson). Varity's administrative decision resulted in the commencement of several lawsuits, including the case at bar which was filed in this district on October 29, 1993. However, acting on Massey–Ferguson's motion, the judge to whom the case was originally assigned transferred the proceedings to the Eastern District of Wisconsin.

On December 12, 1994, the Wisconsin court returned the case to this district, citing the addition of the International Union, United Automobile Aerospace and Agricultural Implement Workers of America (UAW) as a Third Party Defendant and the presence of newly discovered evidence as the basis for its decision.

Due to the delay which was caused by the transfer of the case and its subsequent reassignment, there are several motions by the Plaintiffs [1], Massey–Ferguson [2] and the UAW [3] that are in need of resolutions. The parties appeared before this Court on February 22, 1995 and presented oral arguments in support of their respective positions on the pending motions.

## UAW'S MOTION TO STRIKE THIRD PARTY COMPLAINT

■ On May 27, 1994, the UAW filed a motion in which it requested, *inter alia* the Court to strike or, alternatively, dismiss the third party complaint, citing Massey–Ferguson's (1) allegedly purposeful avoidance of raising the third party issues until after the venue issue had been decided, and (2) failure to state a legally cognizable claim in its pleading. For the reasons that have been set forth below, the UAW's motion shall be granted.

I

On April 28, 1994, Massey–Ferguson filed a Third Party Complaint in which it charged the UAW with a breach of a settlement agreement. *UAW v. Massey–Ferguson, Inc. and Varity Corp.*, No. 90–CV–71368–DT, which serves as the basis of the parties' settlement agreement, was initiated by the UAW in 1990 on behalf of active and retired employees of Massey–Ferguson. The gravamen of the Complaint was that the Defendants had changed the amount of the co-payments that were necessary for the active and retired employees to receive prescription medications. [4]

1. In their motion, the Plaintiffs, Larry Fox, Jackie Noe, Paul Albright, Nancy Stanton, Victor Poulsen, Anne Woshlo, and Marie Clemente, seek to obtain (1) an order that will authorize them to amend their Complaint, (2) the certification of this case a's a class action, and (3) the issuance of a preliminary injunction.

2. In its motion, Massey–Ferguson seeks to obtain a protective order.

3. The UAW seeks the dismissal of the Third Party Complaint.

4. The Complaint contained, *inter alia*, the following allegations:

11. Massey has, pursuant to its collective bargaining agreement with the UAW and its Locals 174, 244, 256 and 1446, agreed to establish and maintain a certain insurance plan and program for the purpose of providing certain medical, surgical, hospital and other health care benefits ... for UAW-represented employees retired from

Defendants' facilities ... and their spouses and eligible dependents for their respective lifetimes. 12. UAW brings Count I of the Complaint on behalf of currently retired employees and their eligible spouses and dependents, all of whom have earned certain vested contractual rights to insurance and health benefits, including a certain prescription drug plan, established and maintained by Massey pursuant to said collective bargaining agreements.

. . . .

19. The aforesaid insurance plan, as negotiated, interpreted and implemented by Defendant Massey and the UAW, gave retired employees and their spouses and eligible dependents a vested contractual right to certain prescription drug plan insurance benefits for the duration of their respective lives. Persons who have retired from active employment with Defendant Massey, and their spouses and eligible dependents, are entitled to receive the insurance benefits negotiated by the parties for the duration of their respective lives, since they have fully performed all the

The parties eventually entered into a settlement agreement, on February 25, 1991, in which "certain former and retired employees" of the Defendants released all of their claims that had existed up to that point in time.[5]

## II

Federal Rule of Civil Procedure 12(b) permits a party to raise several defenses to a complaint, including the failure to state a claim upon which relief can be granted.[6] In order for a complaint to be dismissed on this ground, a court must conclude "beyond [a] doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Carver v. Bunch*, 946 F.2d 451, 452 (6th Cir.1991) (quoting *Haines v. Kerner*, 404 U.S. 519, 521, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (per curiam)). In making its decision, a court must liberally construe the pleadings in favor of the nonmoving party and assume the correctness of all well-pleaded allegations. *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 392 (6th Cir.1975). A determination by the court that no actionable claim has been advanced will result in the dismissal of the Complaint.

In support of its motion, the UAW maintains that the 1991 settlement agreement did

not apply to any claims relating to future breaches of contract. Massey–Ferguson counters that the 1990 litigation included allegations by the employees and retirees that the entire health insurance program—not just the drug card benefit—had vested for life. (*See* 1990 Complaint at ¶¶ 12–13, 19.) Massey–Ferguson notes that the complainants in the 1990 litigation sought to obtain a declaratory judgment and injunctive relief which would have required the Defendants to "provide retired employees and their spouses and eligible dependents, for the duration of their respective lives, with the various insurance benefits negotiated by and among Massey and the UAW and its Locals." (1990 Complaint at ¶¶ A–C.)

The Court disagrees with Massey–Ferguson's position. There is nothing in the settlement agreement that releases Massey–Ferguson from its future conduct or precludes the UAW from pursuing claims on behalf of its membership, including the initiation of lawsuits, which may have accrued subsequent to the execution of the settlement agreement. The Plaintiffs' claims in the case at bar, which challenge Massey–Ferguson's ability to unilaterally change their health care benefit program, could not have been foreseen and resolved by them prior to the date of settlement agreement. The record indicates that the complaining parties in this lawsuit

---

services and satisfied all of the conditions required to entitle them to benefits.

**5.** The portion of the settlement agreement, which is pertinent to this inquiry, reads as follows: *Release of Defendants.* UAW, for itself and for and on behalf of those certain former and retired employees of Massey, Massey–Ferguson or Varity ... hereby releases, acquits and forever discharges Massey, Massey–Ferguson, and Varity, and their divisions, subsidiaries, affiliates, predecessors, successors, assigns, directors, officers, employees and agents, and each of them, from any claims, demands, covenants, actions, suits, obligations, controversies, debts, costs, expenses, damages, judgments, liabilities, attorneys' fees, and causes of action (excepting a claim and action for breach of this Settlement Agreement and Release), of whatever kind, whether known or unknown, vested or contingent, suspected or unsuspected, concealed or hidden, **and which have existed, may have existed, or do exist, and which have been, or could have been, asserted in civil action number 90 CV 71368 DT.** UAW covenants and agrees never to institute, directly or indirectly, and, except as compelled by legal pro-

cess, never to assist in any manner in, any legal, administrative or other action or proceeding of any kind, in any form whatsoever, against Massey, Massey–Ferguson or Varity arising out of the matters alleged in the complaint in civil action number 90 CV 71368 DT, excepting an action for breach of this Settlement Agreement and Release. It is the intent of UAW, Massey, Massey–Ferguson, and Varity in executing this settlement Agreement and Release that it shall be effective as a bar to each and every claim, demand or cause of action described above.... (emphasis added).

**6.** This federal rule of civil procedure also provides that

[i]f, on a motion asserting the defense ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

were unaware of the administrative decision by Massey–Ferguson until 1993. There is no evidence in the record which would support an argument that the parties to the settlement agreement in 1991 intended to address and preclude the kind of unilateral decision by Massey–Ferguson of which the Plaintiffs complain in this lawsuit.[7]

For the reasons that have been set forth, the UAW's motion is granted and Massey–Ferguson's Third Party Complaint against the UAW is dismissed.

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

On June 14, 1994, the Plaintiffs asked this Court for a certification of their claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Massey–Ferguson objects, in part, to their request.

### I

This lawsuit involves the obligation, if any, of Massey–Ferguson to provide for lifetime paid health care benefits for its retirees, certain former employees, and surviving spouses. Prior to the closing of its plants, Massey–Ferguson was a party to several master agreements which covered facilities in Michigan, Iowa, and Ohio. Massey–Ferguson had a separate collective bargaining agreement with UAW and its Local 244 which covered its Racine, Wisconsin warehouse and office employees. However, the labor and management forces at Massey–Ferguson maintained a single insurance agreement which covered all of the employees who were members of the UAW, until 1985. This insurance agreement provided fully paid health care benefits with no deductibles, co-payments, or premiums.

In 1993, Massey–Ferguson notified all of its retirees and other interested parties from these units that it would implement a new

health care benefits plan with an effective of January 1, 1994. This new plan (1) would require all of the enrollees to make monthly premium contributions for medical, vision/hearing, and dental coverage, and (2) contained a clause which provided for a deductible of $300 per person and $600 per family, with a 20% co-payment thereafter until the annual out-of-pocket maximum for an individual ($2,000) or a family ($4,000) is met.

On October 29, 1993, the Plaintiffs filed a Complaint in which they contended, in part, that Massey–Ferguson violated the terms of (1) a labor agreement under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and (2) an employee welfare benefit plan under § 502 of the Employee Retirement Income Security Act, 29 U.S.C. § 1132. In essence, they claim that Massey–Ferguson is obligated to provide them with lifetime pre-paid vested health care benefits. On the basis of these allegations, the Plaintiffs seek a declaratory judgment, injunctive relief, and damages.

The Plaintiffs' proposed class involves (1) retirees, (2) a group of former employees, (3) surviving spouses of retirees, and (4) certain Massey–Ferguson employees from five areas.[8] Specifically, they seek the certification of the following groups as members of their class:

1. Retired employees (and their spouses and eligible dependents) who receive or are entitled to receive pension benefits under the pension plan negotiated with the UAW;

2. Former employees (and their spouses and eligible dependents) whose seniority was broken at or after age 65 and after December 1, 1964 who were not discharged for cause, and who are not eligible to receive a pension;

Fed.R.Civ.P. 12(b).

7. This is borne out by the statement of the attorney for Massey–Ferguson who acknowledged during his oral argument before this Court in February 1995 that he had "thought up" this cause of action against the UAW while he was on an airplane in March 1994—several months subsequent to the initiation of this lawsuit.

8. The groups include several Massey–Ferguson plants; to wit, (1) Southfield Road, Detroit [represented by UAW Local 174], (2) Chicago Road, Detroit [represented by UAW Local 256], (3) Van Born Road, Wayne [represented by UAW Local 256].(4) Des Moines, Iowa [represented by UAW Locals 270 and 1446], (5) Cuyahoga Falls, Ohio, [represented by UAW Local 1505], and (6) Racine, Wisconsin [represented by UAW Local 244].

3. Surviving spouses (and their eligible dependents) of employees who retired on or after January 1, 1965;

4. Surviving spouses (and eligible dependents) who are eligible for a survivor benefit under § 3.05 of the pension agreement where their spouses (a) died before retirement, and (b) died on or after January 1, 1976.

5. Surviving spouses of employees whose employment terminated after age 65 and on or after January 1, 1965 who had insufficient credited service for entitlement to a pension, unless they were discharged for cause;

6. Surviving spouses (and eligible dependents) of employees who currently receive transition or bridge benefits under the insurance agreement; and

7. Employees (and their spouses and dependents) who became totally and continuously disabled while at work or who have physical limitations which temporarily prevent them from working due to disability.

## II

■ Fed.R.Civ.P. 23, which governs class actions, is designed to promote judicial economy by permitting the litigation of common questions of law and fact at one time. *See Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979). This Rule establishes a two-step process for the determination of whether an action is appropriate for certification. *Mayo v. Sears, Roebuck & Co.*, 148 F.R.D. 576, 579 (S.D.Ohio 1993). First, four prerequisites must be satisfied in order for a representative to sue on behalf of all members of the class: (1) the joinder of members must be impracticable; (2) questions of law or fact must be common to the class; (3) the representatives of the class must be typical members of the class; and (4) the representatives must fairly represent the interest of the class. Fed.R.Civ.P. 23(a); *Mayer v. Mylod*, 988 F.2d 635, 640 (6th Cir.1993); *Mayo*, 148 F.R.D. at 579. If all of these requirements are established, the court must determine if one of the following three factual conditions exists in its evaluation of whether a class

action is the best method by which the lawsuit should be tried: (1) there is a risk of incompatible standards of conduct or a risk that the interests of prospective class members would be impaired by an adjudication of others' claims; (2) the party who opposes the class has acted toward members of the class in a uniform manner; or (3) issues which are common to the class predominate over those issues that are not common to the class. Fed.R.Civ.P. 23(b); *Mayer*, 988 F.2d at 640; *Mayo*, 148 F.R.D. at 579. In reaching its decision, the court should not consider the merits of the action. *Mayo*, 148 F.R.D. at 579 (citations omitted). Rather, the court must accept all of the factual allegations within the complaint as being correct and draw all reasonable inferences from these facts. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974). The Plaintiffs bear the burden of proving that their case is appropriate as a class action and satisfies all of the requirements of Fed.R.Civ.P. 23. *Reid v. White Motor Corp.*, 886 F.2d 1462, 1471 (6th Cir.1989), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Senter v. General Motors Corp.*, 532 F.2d 511, 522 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

### A. Requirements of Fed.R.Civ.P. 23(a)

#### 1. Numerosity (23(a)(1))

■ The numerosity requirement mandates that the joinder of all plaintiffs be impracticable—not impossible. *See e.g., Rodriguez v. Berrybrook Farms, Inc.*, 672 F.Supp. 1009, 1013 (W.D.Mich.1987). While no particular number has been set to meet this requirement, classes which number less than one hundred have been certified. *See e.g., Weiss v. York Hospital*, 745 F.2d 786, 808 (3rd Cir.1984) (ninety-two class members); *Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2nd Cir.1972) (seventy plaintiffs); *International Union, United Auto., etc. v. Acme Precision Products, Inc.*, 515 F.Supp. 537, 540 (E.D.Mich.1981) (seventy-eight class members).

■ Here, the Plaintiffs contend that this class consists of (1) approximately one thou-

sand members, all of whom are entitled to lifetime health care benefits pursuant to the terms of various collective bargaining agreements and insurance agreements between Massey–Ferguson and the UAW, and (2) an undetermined number of persons who have not been specifically located or identified. They contend that joinder is impracticable because the proposed class members are scattered throughout several different states. Massey–Ferguson acknowledges that the proposed class contains enough members to support a class action. Thus, the Plaintiffs have passed this first hurdle to class certification. The class is sufficiently numerous so that a joinder of all of its members would be impracticable.

### 2. Commonality (23(a)(2))

■■■ "The commonality requirement is satisfied 'as long as the members of the class have allegedly been affected by a general policy of the defendant, and the general policy is the focus of the litigation.'" *Mayo,* 148 F.R.D. at 580. Moreover,

> [t]he interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is "at least one issue whose resolution will affect all or a significant number of the putative class members" ... For this reason, "[t]he threshold of commonality is not high."

*Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1993) (citations omitted). Thus, the dispositive issue is whether the collective bargaining agreements, which ostensibly provide for lifetime insurance benefits, are common to a resolution of the respective claims by all of the potential class members:

> Rule 23(a)(2) does not require that all questions of law or fact raised in the litigation be common. The test or standard for meeting [this] prerequisite is qualitative

rather than quantitative—that is, there need be only a single issue common to all members of the class. Therefore, this requirement is easily met in most cases. When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.

NEWBERG ON CLASS ACTIONS, Vol. 1, § 3.10, pp. 348-3-51 (3rd ed.).

The Plaintiffs argue that the commonality requirement has been met because all of the proposed class members seek the same continuing lifetime health care benefits that had been promised to them in the collective bargaining and insurance agreements. On the other hand, Massey–Ferguson contends that the Plaintiffs cannot establish the standard of commonality because each of them will be required to rely upon the evidence of individual representations which were allegedly made to the retirees.

It is undisputed that the Plaintiffs have challenged the administrative decision by Massey–Ferguson to change their benefits. This issue is common to all of the Plaintiffs and represents the major component of the relief that they seek to obtain in the case at bar. Thus, although there may have been various oral and written representations upon which the Plaintiffs relied (i.e. various questions of fact), their claims meet the commonality requirement.

### 3. Typicality [9] (23(a)(3))

■ In order "[t]o be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Senter v. General Motors Corp.,* 532 F.2d 511, 525 (6th Cir.1976). Massey–Ferguson concedes that the claims of the individual Plaintiffs are

---

9. The requirements of commonality and typicality often are intertwined:

Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements

therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the class competency of class counsel and conflicts of interest.

*General Telephone Company of Southwest v. Falcon,* 457 U.S. 147, 157–58, n. 13, 102 S.Ct. 2364, 2370–71 n. 13, 72 L.Ed.2d 740 (1982).

typical of those of the class in that each proposed member asserts rights to health care benefits under the UAW negotiated agreements and supplements. However, it takes issue with the Plaintiffs' alleged failure to plead the elements of estoppel with particularity, as required by Fed.R.Civ.P. 9(b). In support of this argument, Massey–Ferguson asserts that the Court need not accept these allegations as true because of their vagueness.

This argument is without merit. The facts, which the Court must take as true for the purpose of evaluating this motion, include that (1) the benefit plan and contract documents were collectively bargained by the UAW, (2) Massey–Ferguson made representations about the lifetime health care benefits for this group to the UAW and to potential class members, and (3) the UAW relied on Massey–Ferguson's representations that the language was sufficient to relay the parties' intent that the benefits were indeed for their lifetimes.

Massey–Ferguson's argument (to wit, when an cause of action is based substantially on oral communications, its treatment as a class would be inappropriate) is unpersuasive. The cases which have been cited by Massey–Ferguson, including *Retired Chicago Police Ass'n v. Chicago*, 141 F.R.D. 477 (N.D.Ill.1992) and *Spencer v. Central States, Southeast & Southwest Areas Pension Fund*, 778 F.Supp. 985, 990 (N.D.Ill.1991), relate only to those circumstances in which the claims are based upon oral communications. Hence, they are inapposite to the facts in this case. Here, the claim of estoppel is largely grounded on the collective bargaining and insurance agreements between the UAW and Massey–Ferguson as well as written assurances by management personnel. Thus, there are many questions of law and fact that are common to all class members, and the Plaintiffs' claims are indistinguishable in large part from other potential class members' claims of estoppel.

Moreover, the fact that the Plaintiffs seek reimbursement for varying amounts of damages for the financial losses which they allegedly sustained as a result of the change in benefits does not defeat the typicality requirement. The fact that the damages may vary between the claimants does not mandate a denial of class certification. *See Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988). In an analogous situation, the Sixth Circuit Court of Appeals commented:

> [T]he problem of individualization of issues often is cited as a justification for denying class action treatment in mass tort accidents. While some courts have adopted this justification in refusing to certify such accidents as class actions, numerous other courts have recognized the increasingly insistent need from a more efficient method of disposing of a large number of lawsuits arising out of a single disaster or a single course of conduct. In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

*Id.* at 1197.

Thus, it is clear that the Plaintiffs have adequately established this factor of typicality.

### 4. *Adequacy of Representation* (23(a)(4))

Adequate representation hinges upon a determination that (1) the representatives do not have interests which are antagonistic to unnamed members of the class, and (2) the representatives will vigorously prosecute the proposed class' interests with qualified counsel. *Senter*, 532 F.2d at 525. This test includes, but is broader than, the typicality inquiry. *Mayo*, 148 F.R.D. at 581 (citation omitted). Massey–Ferguson alleges that (1) the named plaintiffs are not adequate because "they do not possess the knowledge, sophistication or financial resources to prosecute this action vigorously, and to act as a check on class counsel," and (2) the class

counsel has a conflict of interest which cannot be overcome. (*See* Response at 13–14.)

### a. *"Weak Representation" by Plaintiffs*

 Massey–Ferguson avers that in order to adequately represent a class, a plaintiff must be able to check the otherwise unfettered discretion of class counsel. *Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 666 (D.Or. 1991). Massey–Ferguson notes that neither Fox nor Noe could identify any written statement or term within a collective bargaining agreement or an insurance agreement which gave them a contractual right to cost-free lifetime health insurance benefits. According to Massey–Ferguson, this failure by Fox and Noe makes their representation inadequate given that "under the law, the written terms of the benefit plan are the *only* permissible source of a lifetime obligation." (Response at 26, citing *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 607–08, 616 (7th Cir. en banc ), *cert. denied,* 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993) and *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir.1989).) Contrary to Massey–Ferguson's argument, these cases do not support its position on this issue.[10]

 The law does not obligate the Plaintiffs to know every aspect of the law in order to adequately represent a class. If such a requirement were imposed, all class actions would require the retained counsel to serve as plaintiffs. Here, Noe and Fox fully understand the nature of their claims against Massey–Ferguson. It is their specific belief that they are entitled to lifetime health insurance benefits. This clearly does not constitute an "alarming unfamiliarity" with the basic elements of their case, as Massey–Ferguson suggests. (*See* Response at 26.) There is no indication that the Plaintiffs are not, or would not become, the vigorous representatives which the law requires. Because the amount and type of health care received free of charge is directly affected by Massey–Ferguson's alleged wrongdoing in this case, the Plaintiffs have a keen interest in its outcome. *See In re Goldchip Funding Co.,* 61 F.R.D. 592, 594 (M.D.Pa.1974) ("even unknowledgable and inexperienced Plaintiffs might meet the requirements of Rule 23 by demonstrating a keen interest in the progress and outcome of the litigation").

Massey–Ferguson next suggests that the named plaintiffs are inadequate as representatives because they cannot afford the costs of litigation or an adverse disposition of this matter. However, the UAW is funding this action, and there is no suggestion that the litigation costs will exceed its means. Moreover, if financially disadvantaged people are excluded as potential class representatives because of their economic circumstances, the "keen interest" requirement would never be satisfied. *See George v. Beneficial Finance Co.,* 81 F.R.D. 4, 7 (N.D.Tex.1977) (where action is financed by third party, plaintiffs with limited resources can be adequate representatives).

### b. *Conflict of Interest of Plaintiffs' Counsel*

 Roger McClow, counsel for the Plaintiffs, has a long-standing relationship with the UAW, due in large part to his representation of the Union in other matters. The UAW is paying his fees and underwriting the costs of this litigation. Massey–Ferguson attacks the selection of McClow as the counsel for the class because, in its judgment, he is neither qualified to litigate this case nor free from a conflict of interest with regard to the relationship between the litigants and the UAW. It is Massey–Ferguson's position that, in view of its third party complaint in which it asserts that the Union

---

10. For example, in *Bidlack,* the majority decision barred extrinsic evidence from adding terms to an otherwise complete contract. However, the Seventh Circuit Court of Appeals noted that extrinsic evidence is admissible to show that a written contract, which appears on its face to be clear, is actually ambiguous. 993 F.2d at 608. The court also noted that, in order for extrinsic evidence to be admitted for the purpose of modifying an existing contract, there must be language which can be unequivocally described as ambiguous or the existence of a "yawning void that cries out for an implied term." *Id.* Similarly, in *Ryan,* the court merely reiterated that a court need not consider extrinsic evidence where the pertinent provisions of the contract are not ambiguous. 877 F.2d at 602.

breached a release and a covenant not to sue, "every dollar [Massey–Ferguson] spends to respond to [McClow's actions] comes out of the UAW's pocket as damages for breach of its covenant not to sue." (Response at 15.) Massey–Ferguson maintains that this will present McClow with a difficult ethical and legal dilemma:

If he prevails in his position, then the UAW has breached its release, and will have to indemnify [Massey–Ferguson] for the cost of any additional benefits the Court orders it to pay Plaintiffs. *Every penny* McClow wins for his clients, the temporary nominal class members, will come out of the pocket of his long-term and real client, the UAW.

(Response at 15.) Thus, the argument continues, if the UAW decides that its interests are inimical to those of the class, it may stop funding the suit or begin to direct the action in a manner that is unfavorable to the Plaintiffs.

In at least one case, a district court allowed an attorney to represent a class where (1) there was an ongoing relationship between the UAW and the class counsel, (2) the UAW was potentially liable to the Plaintiffs, and (3) the UAW was paying litigation expenses and attorney fees. *Hazel v. Lynch Corp.*, IP 84–1352C (S.D.Ind.1990). Here, there is every indication that McClow has vigorously pursued this action. Moreover, given that the claim against the UAW in the case at bar has been dismissed, there is no evidence that this Union will be required to indemnify Massey–Ferguson even if the Plaintiffs prevail.

 Massey–Ferguson also alleges that McClow has failed to prosecute this case adequately. It maintains that McClow failed to file this lawsuit in a timely manner. This allegation is based upon Massey–Ferguson's representation that McClow was apprised of the change in the benefits plan in August 1993, but failed to file the Complaint in this

cause until October 29, 1993. McClow asserts that he filed the Complaint approximately three weeks after he was contacted by his clients—approximately two months before the challenged benefits plan was implemented. In making an assessment of Massey–Ferguson's charge, the Court concludes that a delay of two months under the circumstances does not represent a lack of diligence on the part of McClow. Hence, this argument must be rejected.

Massey–Ferguson next argues that McClow has made several errors in his pleadings, noting that he filed a jury demand on behalf of his clients along with an inconsistent contention that they did not have an "adequate remedy of law." Massey–Ferguson avers that the Plaintiffs' application for mental distress damages and McClow's alleged failure to plead estoppel with particularity should provide this Court with a basis upon which to make a finding of incompetence of counsel. Without passing on the validity of the jury demand, McClow's insertion of a pleading for mental distress damages appears to be a bona fide attempt to change the law and to preserve the issue for appeal. Finally, an examination of the pleadings does not support Massey–Ferguson's contention that the Plaintiffs' estoppel claim was so inadequately pled that it supports an argument in favor of declaring McClow to be incompetent to serve as a counsel in a class action.

Massey–Ferguson's third claim of error focuses upon McClow's alleged failure to seek a preliminary injunction prior to the change in benefits. In actuality, McClow filed a motion for a preliminary injunction on the last business day before Christmas of 1993. This is not indicative of McClow's failure to prosecute the action, because his motion was filed prior to the alleged breach.[11] Finally, the remaining contentions by Massey–Ferguson are also without merit and do not warrant extended discussion.[12]

---

11. It is ironic that this conduct by McClow has been cited as being improper, in that his motion for a preliminary injunction was substantially delayed, in part, because of Massey–Ferguson's request to transfer the case from this district to the Eastern District of Wisconsin.

12. Massey-Ferguson's remaining points include allegations that (1) McClow canceled the hearing for a preliminary injunction pending the hearing on the motion to transfer the case to the Eastern District of Michigan, (2) McClow's failure to move for class certification until the expiration of

Thus, the Court is satisfied that the Plaintiffs have satisfied their burden of demonstrating the existence of the four requisite elements of Fed.R.Civ.P. 23(a).

## B. *Requirements of Rule 23(b)*

 If all of the requirements for Rule 23(a) have been established, only one of the provisions under Rule 23(b) need be met for class certification. Here, the record supports the conclusion that the Plaintiffs have fulfilled their burden for class certification. First, the prosecution of separate actions could lead to inconsistent adjudications which would fail to establish congruous standards of conduct for Massey–Ferguson. If each retiree separately adjudicated his or her claim, different results are inevitable, especially considering the fact that the retirees reside in several states. This would lead to the obvious conclusion that Massey–Ferguson could prevail in some cases and lose in others which, in turn, would lead to inconsistent and, perhaps, inequitable results. Moreover, adjudications with respect to individual members could substantially impair the interests of those persons who are not parties to this lawsuit.

Next, it is abundantly clear that the administrative decision by Massey–Ferguson with regard to the then-existing health care benefits affected the entire proposed class, thus making the issue of a permanent injunction and corresponding declaratory relief facially appropriate. Thus, although only one factor need be met, it appears that at least two of the three requirements of Rule 23(b) have been established.

## C. *Subclass Definition*

Rule 23(c)(4)(B) provides that a class may be divided into subclasses when it is appropriate to do so. Massey–Ferguson asserts that the proposed class definition contains sub-classes which cannot be certified. These include (1) employees who terminated their employment after the age of sixty four for any reason other than a discharge for cause, with an insufficient amount of seniority which

would entitle them to a benefit under the pension plan, and their eligible dependents, (2) surviving spouses of these employees, and (3) surviving spouses of those employees who are entitled to receive transition and bridge benefits under the negotiated insurance agreements and their eligible dependents. Moreover, Massey–Ferguson submits that the threshold requirement of subclass membership has not been satisfied because the Plaintiffs have not identified any members for this group.

The Plaintiffs take issue with this argument, contending that the subclasses' interests are sufficiently aligned with the interests of the members of every other subclass. Because the record is somewhat deficient on this issue, the Court shall reserve its judgment with regard to the question of subclass certification. *See* Fed.R.Civ.P. 23(c)(1) (court can alter or amend decision regarding class certification prior to decision on merits).

### III

Accordingly, the Plaintiffs' request for class certification is granted.

## PLAINTIFFS' MOTION TO AMEND COMPLAINT

On June 27, 1993, the Plaintiffs filed a motion for leave to amend their Complaint which, if granted, would (1) presumably reflect the status of Massey–Ferguson as a division of Varity, (2) allege a claim of tortious interference, (3) incorporate an additional group of class members, and (4) correct some typographical errors and clarify other language. Massey–Ferguson objects, in part, to the motion.

### I

Fed.R.Civ.P. 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Although there is a general presumption in favor of allowing a party to amend its pleadings, a court may deny such a request if there has been (1) an undue delay, (2) bad faith on the part of the

---

nearly eight months after the case was filed, and (3) McClow's unjustified reliance on reply briefs.

*See* Response at 21–24.

movant, (3) prejudice suffered by the opposition, or (4) evidence that an amendment would be futile because it cannot withstand a motion to dismiss. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 112 (6th Cir.1989); *Neighborhood Dev. Corp. v. Advisory Council on Historic Preservation*, 632 F.2d 21, 23 (6th Cir.1980).

Although Massey–Ferguson objects to several portions of the proposed amended Complaint,[13] the Court shall only address those arguments which focus upon the actual amendments to the original Complaint. In this regard, Massey–Ferguson's principal opposition is to the addition of a claim against a proposed additional Defendant, Towers Perrin, for its alleged tortious interference with contractual relations.

In their proposed amendment, the Plaintiffs assert that Towers Perrin knew (1) of the relationship between Massey–Ferguson and its retirees regarding health care benefits, (2) that Massey–Ferguson's initial position was that these benefits could not be changed, (3) that Massey–Ferguson had given express verbal and written promises that the benefits would not be changed, and (4) that Massey–Ferguson's attorneys had rendered at least two separate opinions in which they determined that the benefits could not be changed. Despite all of this, the Plaintiffs contend, Towers Perrin actively encouraged Massey–Ferguson to breach its agreement with the Plaintiffs.

Massey–Ferguson submits that neither the Employee Retirement Insurance Security Act (ERISA) nor the Labor Management Relations Act (LMRA) authorize this Court to exercise jurisdiction over the claim against Towers Perrin.

## II

### A. ERISA Preemption

■ Section 514(a) of ERISA, 29 U.S.C. § 1144(a), provides that this statute "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." This section is given broad interpretation. *See e.g., Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45, 107 S.Ct. 1549, 1551, 95 L.Ed.2d 39 (1987). A "law relates to an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983). While there is no requirement that the law deal directly with an employee benefit plan, "some state laws may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law relates to the plan." *Id.* at 98, 100 n. 21, 103 S.Ct. at 2900–01, 2901 n. 21. Moreover, § 1144 preempts state laws only as they relate to ERISA plans. *Id.* at 97, 103 S.Ct. at 2900 (state anti-discrimination law is unaffected by ERISA preemption "insofar as it prohibits employment discrimination in hiring, promotion, salary and the like").

In enacting § 1144, it was the intent of Congress that the law exclusively control the administration and regulation of employee benefit plans. *See Dedeaux*, 481 U.S. at 45–47, 107 S.Ct. at 1551–53. A state law that may have some minimal effect on the payment of ERISA benefits without affecting the mechanics of an ERISA plan is not necessarily preempted. *See Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 482–83, 112 L.Ed.2d 474 (1990). ERISA only preempts (1) laws that are specifically designed to affect employee benefit plans, (2) laws of general applicability that effectively regulate employee benefit plans, and (3) specific causes of action in which the denial of benefits is a central factor. *See Ingersoll–Rand*, 498 U.S. at 139–40, 111 S.Ct. at 482–83; *Mackey v. Lanier Collection Agency & Serv., Inc.* 486 U.S. 825, 841, 108 S.Ct. 2182, 2191–92, 100 L.Ed.2d 836 (1988); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 341 (6th Cir.1993) (claim preempted where resolution

---

13. Massey–Ferguson objects to the filing of an amended Complaint which seeks damages for mental distress, contending that the Plaintiffs have previously stipulated to strike the claim.

Massey–Ferguson also maintains that the Plaintiffs have failed to cure their defects in Count IV (to wit, the estoppel claim).

of state law claim would require determination of ERISA plan eligibility).

Similarly, § 502 of ERISA, 29 U.S.C. § 1132, allows "anyone who qualifies as a 'participant or beneficiary' of an employee benefit plan [to] sue under ERISA to enforce various rights conferred by ERISA. [This section] impliedly preempts actions brought in state court that could have been brought under ERISA's civil enforcement section." *Alexander v. Electronic Data Sys. Corp.* 13 F.3d 940, 943 (6th Cir.1994).

Here, there is no indication that the asserted claims against Towers Perrin fall within one of the preempted categories. It is not brought to enforce the rights of an aggrieved party. The UAW claims tortious interference. However, Massey–Ferguson cites several cases for the proposition that ERISA bars any effort to transform a claim for a breach of a pension plan into a tort. *See Kuhl v. Lincoln Nat'l Health Plan*, 999 F.2d 298, 302 (8th Cir.1993), *cert. denied*, 510 U.S. 1045, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994) (tortious interference with contract preempted); *Tingey v. Pixley–Richards West, Inc.*, 953 F.2d 1124, 1131 (9th Cir.1992) (same); *Maciosek v. Blue Cross & Blue Shield United of Wisconsin*, 930 F.2d 536, 538, 541–42 (7th Cir.1991) (claims of tortious interference with contract "obviously are preempted," affirming Rule 11 sanctions against lawyer who pled claim). However, none of these cases are applicable here in that they assert claims against the employee benefit plan, the employer, or both. Here, the proposed claim of tortious interference is brought specifically against a non-fiduciary third party as a § 301 federal common law claim or as a non-preempted state law claim.

When this proposed claim is viewed in light of ERISA policy, it becomes clear that this is not the type of claim that Congress intended to preclude. ERISA preemption was intended to prevent conflicting regulation of employee benefits plans. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 14–15, 107 S.Ct. 2211, 2218–19, 96 L.Ed.2d 1 (1987). The proposed claim against Towers Perrin— even if it had been brought under ERISA— could not lead to conflicting regulations of benefit plans and is not preempted by ERISA.

## B. *LMRA Jurisdiction*

██ Although this claim is not preempted by ERISA, the Court may find this charge against Towers Perrin to be futile if (1) it is preempted by the LMRA or (2) the Court does not have jurisdiction of the subject matter. Section 301 of the LMRA states that

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties.

29 U.S.C. § 185. In the Sixth Circuit, "courts have generally held that [§ 301] creates federal jurisdiction only over parties to the contract being sued upon." *Metropolitan Detroit Bricklayers District Council, etc. v. J.E. Hoetger & Co.*, 672 F.2d 580, 583 (6th Cir.1982); *see also*, *Service, Hospital, etc. Local No. 47 v. Commercial Property Services, Inc.*, 755 F.2d 499, 506 (6th Cir.) ("a district court does not have subject matter jurisdiction over a non-signatory to a collective bargaining agreement, where no rights or duties of the non-signatory are stated in the terms and conditions of the contract"), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985). Moreover, a recent unanimous decision by the Supreme Court held that

> a suit properly brought under § 301 must be a suit either for violation of a contract between an employer and a labor organization representing employees in an industry affecting commerce or for violation of a contract between such labor organizations.

*Wooddell v. International Bhd. of Elec. Workers Local 71*, 502 U.S. 93, 98, 112 S.Ct. 494, 498, 116 L.Ed.2d 419 (1991). Accordingly, inasmuch as Towers Perrin is not (1) a party to the collective bargaining agreements at issue in this case and is without any rights or duties under the agreements, or (2) being sued for a violation of a contract, the LMRA does not confer subject matter jurisdiction

over Count V of the proposed claim against this Defendant.

### C. Supplemental Jurisdiction (LMRA Preemption)

■ The Plaintiffs aver that the proposed amendment is viable because of the ability of the Court to exercise its supplemental jurisdiction authority. However, their claim against Towers Perrin is preempted by the LMRA. The LMRA preempts a state law claim when its application would require an interpretation of a collective bargaining agreement. *Lingle v. Norge Div. of Magic Chef,* 486 U.S. 399, 413, 108 S.Ct. 1877, 1885, 100 L.Ed.2d 410 (1988). In light of this, the Sixth Circuit has created a two part process for determining if a claim is preempted by the LMRA. *DeCoe v. General Motors Corp.,* 32 F.3d 212, 216 (6th Cir.1994). First, the district court should investigate whether proof of the state claim necessitates an interpretation of the collective bargaining agreement. *Id.* (citing *Terwilliger v. Greyhound Lines, Inc.,* 882 F.2d 1033, 1037 (6th Cir. 1989), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2204, 109 L.Ed.2d 531 (1990)). Next, the court must determine whether the right which the plaintiff claims has been abridged has been created by the collective bargaining agreement or by state law. *Id.* "If the right both is borne of state law and does not invoke contract interpretation, then there is no preemption. However, if neither or only one criterion is satisfied, section 301 preemption is warranted." *Id.*

■ Here, the proposed amendment presumably asserts a claim of tortious interference with a business relationship under the laws of Michigan. To demonstrate a *prima facie* case of this tort, the Plaintiffs must demonstrate (1) the existence of an expectancy or a valid business relationship, (2) the interferer had knowledge of the expectancy or relationship, (3) an intent to induce or cause a breach of the expectancy or relationship, and (4) damage to the party whose expectancy or relationship has been disturbed. *Trepel v. Pontiac Osteopathic Hosp.,* 135 Mich.App. 361, 374, 354 N.W.2d 341 (1984) (citation omitted).

Here, the valid business relationship or expectancy is Massey–Ferguson's alleged obligation under the collective bargaining agreement to provide the Plaintiffs with free health care under the collective bargaining agreement. In order to deduce whether Towers Perrin had an intent to induce or cause a breach of the relationship, it would be necessary for the Court determine whether the asserted action by Towers Perrin could cause a breach. Because such a conclusion would require an interpretation of the agreement, this claim is preempted by the LMRA.

### III

Accordingly, the Plaintiffs' motion to amend their complaint is denied as to their proposed claim against Towers Perrin and granted as to all other amendments.

## MASSEY-FERGUSON'S MOTION FOR PROTECTIVE ORDER

### I

On August 31, 1994, Massey–Ferguson submitted a motion for the entry of a protective order pursuant to Fed.R.Civ.P. 26(c). On April 21, 1994, Towers Perrin, a consulting firm utilized by Massey–Ferguson, produced documents in response to the Plaintiffs' subpoenas.[14] The produced documents included papers that had been prepared by Massey–Ferguson's counsel, including a Litigation Risk Analysis (LRA) which contained confidential material. During the process of exploring the produced documents, the Plaintiffs examined seven piles of papers that had

---

14. Prior to the production of the documents, Massey–Ferguson and the Plaintiffs had a disagreement over the language within a proposed protective order which they thought had been resolved during a telephone conference with Judge Rudolph T. Randa of the Eastern District of Wisconsin. However, this dispute arose from a clear misunderstanding between the parties, in that Massey–Ferguson believed that the Plaintiffs had agreed to treat all of the Towers Perrin documents on a confidential basis and not to disclose their content to the UAW. On the other hand, the Plaintiffs assert that they only agreed to treat the UAW in the same manner as any other non party to the action. This is the subject of the dispute that surrounded the confidentiality issue relating to the Towers Perrin documents.

been placed in a room for his review. This search lasted several days. On May 10, 1994, the documents were copied and delivered to the Plaintiffs' counsel one week later.

On June 6, 1994, the Plaintiffs filed a reply brief in support of their motion for a preliminary injunction which referenced some of the Towers Perrin documents. On June 15, 1994, after realizing that the LRA had been accidentally revealed to the Plaintiffs, Massey–Ferguson asked for its return. When the Plaintiffs refused, this motion followed.

Massey–Ferguson seeks an order that would, in essence, (1) direct the Plaintiffs to return all copies of the LRA immediately, and (2) prevent them from disclosing the content of any Towers Perrin document to the UAW or any other person.

## II

Massey–Ferguson states that disclosure of the LRA, which had been prepared by its attorneys, was inadvertent and occurred only after it had taken significant steps to avoid the accidental release of privileged information. It acknowledges that its main goal in seeking this protection is to avoid disclosure of the LRA to the UAW, other labor unions, and the plaintiffs' counsel in several other pending cases against Varity and its subsidiaries.

In regard to its argument for the confidentiality of the Towers Perrin documents, Massey–Ferguson asserts that it agreed to allow the Plaintiffs with access to the documents only after they made a commitment that the content of the papers would not be disclosed to the UAW in accordance with Local Rule 7.11 of the Eastern District of Wisconsin, which requires specific designation of documents as confidential and sets certain requirements for the party receiving such confidential documents.

## III

### A. Discovery and Privilege in General

Fed.R.Civ.P. 26 dictates the general provisions governing discovery:

Parties may obtain discovery regarding any matter, not privileged, which is rele-

vant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party ... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed.R.Civ.P. 26(b)(1). Where there is a dispute as to whether discovery is privileged or irrelevant, the court can enter a protective order which limits the scope of disclosure, seals certain documents, or dictates that confidential research or other information not be revealed or be revealed only in a designated manner. Fed.R.Civ.P. 26(c).

 "Privilege" attaches in certain instances where an attorney has communications with his client. The attorney client privilege has been explained as follows:

"(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to the purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except [where] the protection be waived."

United States v. Goldfarb, 328 F.2d 280, 281 (6th Cir.), cert. denied, 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964) (quoting 8 WIGMORE, EVIDENCE § 2292 at 554). Thus, communications between an attorney and his client are privileged if they are made in private for the purpose of obtaining legal services. Hydraflow, Inc. v. Enidine, Inc., 145 F.R.D. 626, 630 (W.D.N.Y.1993). However, "the privilege only applies if the lawyer is providing legal advice or services, and will not protect disclosure of non-legal communications where the attorney acts as a business or economic advisor." Id. at 631.

Privilege also attaches to certain work products of an attorney. The work product privilege is codified in Fed.R.Civ.P. 26(b)(3), which dictates that a court "shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." The overriding

purpose of the attorney-client and the work product privileges is to encourage the proper functioning of the adversary system. *In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3rd Cir.1979).

### B. *Litigation Risk Analysis*

The LRA consists of (1) confidential communications between Varity and its counsel that are shared with its consulting actuary, (2) legal advice to Varity, Massey–Ferguson, and Kelsey–Hayes [15] regarding modifications that could be made in their benefit plans, (3) advice as to the state of the law in different parts of the country, along with recommendations of legal strategies for anticipated litigation, and (4) a numerical evaluation (1 to 5) of the probability of success in anticipated litigation brought by various groups of former employees. Because it is clear and undisputed that a privilege attaches to these documents, the only issue which must be decided by the Court is whether the privilege was waived.

#### 1. *Waiver by Sharing of Documents*

■ The Plaintiffs contend that privilege was waived when the documents were shared between Kelsey–Hayes, Massey–Ferguson, and Towers Perrin. They claim, with no citation,[16] that "the very fact that these legal opinions were shared between the two separate corporations constitutes a waiver of the privilege." (Response at 9.) This argument has no merit and is problematic for several reasons. First, Massey–Ferguson and Kelsey–Hayes are not two separate corporations. Massey–Ferguson is a division of Varity, which fully owns Kelsey–Hayes. It is well settled that a privilege is not waived by communications which extend throughout a corporate structure that encompasses a parent corporation, subsidiaries, and affiliates. *See e.g., United States v. American Tel. & Tel. Co.*, 86 F.R.D. 603, 616 (D.D.C.1979) (corporate "client" includes corporation coun-

sel, parent organization, subsidiaries, and affiliates); *Roberts v. Carrier Corp.*, 107 F.R.D. 678, 687–88 (N.D.Ind.1985) (identical nature of legal interest between two wholly owned subsidiaries of common parent retained privilege); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1184–85 (D.S.C.1974) ("the fact that communications are among formally different corporate entities which are under common ownership or control leads this court to treat such interrelated corporate communications in the same manner as intra-corporate").

■ Varity, Massey–Ferguson, and Kelsey–Hayes are all part of one corporate entity, as well as clients of the same law firm. The LRA is a document which analyzes the litigation risk of, and gave legal advice to, each of the three entities. Because communications between joint clients and their attorneys are "privileged in any action between one or all of the clients and a third person,"[17] the fact that the document was shared among the three entities does not waive privilege. Moreover, disclosure to a third person with a common interest has been held not to waive privilege when asserted against adversaries. *See e.g., American Standard, Inc. v. Bendix Corp.*, 71 F.R.D. 443, 446–47 (W.D.Mo.1976) (no waiver of work product immunity where interview transcripts of work product given to non employee, non expert witness).

■ Similarly, the disclosure of the document to Towers Perrin does not constitute a waiver of the asserted privilege. The attorney-client privilege is not waived through a communication to a third party where it is made in furtherance of legal services. *See In re Grand Jury Investigation (Schroeder )*, 842 F.2d 1223 (11th Cir.1987); *United States v. White*, 617 F.2d 1131, 1135 (5th Cir.1980). Thus, the sharing of the LRA with Towers Perrin, who served as the actuarial consul-

---

**15.** Although Massey–Ferguson is a division of Varity, Kelsey–Hayes is a subsidiary corporation.

**16.** The Plaintiffs have cited three cases, all of which stand for the proposition that if a subsidiary has been preserved as a separate corporation, neither the parent nor the subsidiary can choose to ignore the distinction for particular

purposes. *Esmark, Inc. v. NLRB*, 887 F.2d 739 (7th Cir.1989); *Miami Foundry Corp. v. NLRB*, 682 F.2d 587 (6th Cir.1982); and *EPE, Inc. v. NLRB*, 845 F.2d 483 (4th Cir.1988).

**17.** Weinstein on Evidence § 503(d)(5):

tant of Varity's benefit plans, did not waive the privilege.

### 2. Waiver by Deposition Testimony

 The Plaintiffs assert that privilege as to the documents is waived because Clement Devine, who was Massey–Ferguson's General Benefits Manager, testified about the legal opinion in the LRA without any objection from him or his attorney. However, contrary to the Plaintiffs' implication, Devine's testimony only addressed the fact that a firm had been retained to conduct such an analysis. Because his testimony did not touch on the details of the LRA, this clearly does not constitute a waiver.

### 3. Waiver by Inadvertent Production and Passage of Time

 When a producing party claims inadvertent disclosure, it has the burden of proving that the disclosure was truly inadvertent. *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.,* 132 F.R.D. 204, 207 (N.D.Ind.1990). Three lines of authority have evolved with regard to the claim of inadvertent disclosure. The first is the objective approach, under which any disclosure—whether intentional or inadvertent—constitutes a waiver of the attorney client privilege. *See Underwater Storage, Inc. v. United States Rubber Co.,* 314 F.Supp. 546, 548–49 (D.D.C.1970); *International Digital Sys. Corp. v. Digital Equip. Corp.,* 120 F.R.D. 445 (D.Mass.1988). The subjective approach reasons that an inadvertent disclosure can never constitute a waiver because there was no intent to waive the privilege at the time of the act. *See Connecticut Mut. Life Ins. Co. v. Shields,* 18 F.R.D. 448, 451 (S.D.N.Y.1955). The third approach, termed the intermediate approach, requires that a court consider the following factors: (1) the reasonableness of precautions taken in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the magnitude of the disclosure, (4) any measures taken to mitigate the damage of the disclosures, and (5) the overriding interests of justice. *Federal Deposit Ins. Corp. v. Ernst & Whinney,* 137 F.R.D. 14, 17 (E.D.Tenn.1991); *Hydraflow, Inc. v. Eni-*

*dine, Inc.,* 145 F.R.D. 626, 637 (W.D.N.Y. 1993); *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co.,* 132 F.R.D. 204, 208–09 (N.D.Ind.1990); *Federal Deposit Ins. Corp. v. Marine Midland Realty Credit Corp.,* 138 F.R.D. 479 (E.D.Va.1991). *See also Prudential Ins. Co. v. Turner & Newall, PLC,* 137 F.R.D. 178 (D.Mass.1991) (waiver occurred where disclosing party made no effort to retract disclosed documents). The latter approach is inherently the most fair and appropriate manner in which to analyze this situation.

#### a. Precautionary measures

Massey–Ferguson contends that it took the precautionary measure of going through the documents prior to the time that it gave the Plaintiffs access to them. It notes that only one document was accidently disclosed out of approximately sixty thousand pages of documents that were reviewed by the Plaintiffs. Massey–Ferguson insists that it was told by Towers Perrin that the LRA had been placed in a desk drawer of a Towers Perrin executive. Thereafter, Massey–Ferguson submits that the Plaintiffs were permitted to examine the documents in an examination room after its own internal review. However, Massey–Ferguson has provided no evidence upon which to base this assertion. The only factor in Massey–Ferguson's favor is that the cover sheet for the documents was clearly marked "privileged and confidential."

The Plaintiffs maintain that the privileged documents were easily discovered in a pile of documents from the same time period. It is their position that (1) the LRA was, in reality, several distinct documents, and (2) there were two copies of at least four of the portions of the LRA. Moreover, they claim that Massey–Ferguson did not review the documents which had been tagged for copying even though it had exclusive access to the papers for several days prior to being copied and delivered. The Plaintiffs also assert that every page of the LRA was not marked as being confidential.

In summary, it is clear that Massey–Ferguson could have taken further precautions, such as marking each individual sheet as confidential or examining the documents (1)

immediately prior to the Plaintiffs' viewing and/or (2) prior to copying the tagged material. However, the precautions that were taken by Massey–Ferguson appear to have been marginally adequate.

b. *Number of inadvertent disclosures*

This factor weighs slightly in favor of the Plaintiffs. The LRA consists of at least twelve distinct portions of the larger document. There were two copies of four of these documents. As the Plaintiffs note, the documents were "separate, in plain sight, and in a pile with documents from the same time period." (Response at 18.) Thus, the number of disclosures is relatively high for the amount of documents within the production room.

c. *Magnitude of disclosure*

The disclosure here was complete. Massey–Ferguson only discovered the disclosure upon reading the Plaintiffs' brief which contained citations from the document. Thus, the confidentiality of the document cannot be restored. However, identifying the documents as privileged could affect the Plaintiffs' distribution of them to third parties and other litigants against the corporation.

d. *Mitigation of damage*

Here, Massey–Ferguson did not realize that the LRA had been exposed to the Plaintiffs until several weeks after their disclosure. Moreover, after the disclosure of the privileged documents became known, more than two months expired before this motion was filed. Thus, it appears that Massey–Ferguson did little to mitigate the damage which may have been caused by this disclosure.

e. *Interest of Justice*

The Plaintiffs contend that fairness considerations weigh in their favor with regard to the pending motion because they display (1) Varity's motives and understanding with regard to its commitments to Massey–Ferguson retirees, (2) Varity's method of withholding facts in this and other litigation, and (3) evidence that there was no belief by Massey–Ferguson in 1992 that the 1990 settlement agreement relieved it from liability for future claims by retiree health care benefits.

On the other hand, the documents go to the heart of the attorney-client relationship between Massey–Ferguson and its attorneys, and do not appear to have much factual content. Moreover, any information contained within these documents will lead to discoverable information that has already been detailed and evaluated by the Plaintiffs, thus making their relinquishment less onerous for them. However, granting the proposed protection of the documents would tend to condone Massey–Ferguson's carelessness.

Based on these five factors, the Plaintiffs have an advantage over Massey–Ferguson in terms of the issue relating to a waiver of the attorney/client privilege. However, prior to making a final determination of this dispute, the Court must evaluate whether the work product privilege can be asserted.

4. *Work Product Privilege*

 Opinion work product is any material which reflects the attorney's mental impressions, opinions, conclusions, judgments or legal theories. *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947); *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 63 (7th Cir. 1980). Attorney work product privilege does not exist to protect a confidential relationship between the client and his attorney. Instead, its purpose is to "promote the adversary system by safeguarding fruits of attorney's trial preparations from discovery attempts of opponents." *Chubb Integrated Sys. v. Nat'l Bank of Washington*, 103 F.R.D. 52, 63 (D.D.C.1984); *United States v. American Tel. & Tel. Co.*, 206 U.S.App. D.C. 317, 642 F.2d 1285, 1299 (1980). Therefore, while "not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney," *Hickman*, 329 U.S. at 510, 67 S.Ct. at 393, a disclosure which does not destroy the secrecy of an attorney's trial preparation does not waive the attorney work product privilege.

The parties cite only two cases for a discussion of the applicable standard of inquiry for a claim of work product privilege. In *Carter v. Gibbs*, 909 F.2d 1450 (Fed.Cir. 1990), the government inadvertently attached an internal memo to a motion for an extension of time. In evaluating whether the document contained information that is protectable under the work-product doctrine (the court determined that there was no attorney/client communication in the document), the court found the privilege to have been waived:

It is irrelevant whether the attachment was inadvertent, as the government alleges. A voluntary disclosure of attorney work product to an adversary in the litigation for which the attorney produced that information defeats the policy underlying the privilege; in these circumstances, the criteria for waiver of the work-product and attorney-client privileges are equivalent.... Granting the motion would do no more than seal the bag from which the cat has already escaped.

909 F.2d at 1451 (citations omitted).

Massey–Ferguson cites *Fleet National Bank v. Tonneson & Co.*, 150 F.R.D. 10, 13–16 (D.Mass.1993), in which counsel inspected approximately 50,000 documents and removed two volumes of a three volume accountant's report. The court found that the inadvertent production of the third volume did not waive the work product privilege:

The attorney-client privilege often conceals information that has a direct bearing on the proper resolution of matters in dispute; the work product privilege rarely, if ever, does. The substantive content of work product, particularly so-called opinion work product, is almost certainly of no legitimate use to an opponent. While it would no doubt provide a tremendous tactical advantage to an adversary to be able to pry in to the "mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning litigation," Fed.R.Civ.P. 26(b)(3), a competent adversary will never

need access to such information to prepare and present his or her case effectively ...

The court concluded that

there is no reason to find waiver here. Defendant's counsel surely undertook more than minimal precautions to avoid inadvertent disclosure. It screened the documents ... With respect to the equities, there is no claim by [the plaintiff] that it was mislead, that it relied to its detriment on a limited disclosure of Volume III or that it would otherwise be unjust, this point, not to compel production.

*Id.* at 13–16. Thus, while it is clear that attorney-client and work product privilege are based upon two separate philosophies, the court in *Fleet National Bank* apparently underwent a similar balancing analysis for each type. Here, based upon reasoning which is similar to that of the analysis regarding the attorney/client privilege, the factors weigh against finding that the documents are protected by the work product privilege.

Accordingly, Massey–Ferguson's request for the return of all copies of the LRA is denied. However, based on the pendency of other litigation involving Varity and its subsidiaries, the Plaintiffs (1) may only use the challenged information for prosecuting this case and (2) may not reveal any additional information to the UAW or other entities who are not parties to this legal proceeding.

### C. Confidentiality of Towers Perrin Documents

Massey–Ferguson's goal in asserting the confidentiality of the Towers Perrin documents is the avoidance of disclosure to the UAW. However, because of the passage of time since the filing of the motion, several of the issues on which the Plaintiffs and Massey–Ferguson disagreed are now moot. For example, the UAW, as a party to this lawsuit, has already had access to a large number of the documents in question. Moreover, the Court is not convinced that there was an agreement between the parties that the Towers Perrin documents would be treated as confidential. Finally, Massey–Ferguson has not made any showing that a protective order for the Towers Perrin documents is warrant-

ed. Thus, Massey–Ferguson's motion for a protective order relating to the remaining Towers Perrin documents must be denied.

## IV

Accordingly, Massey–Ferguson's motion for a protective order is granted in part and denied in part.

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On December 23, 1993, the Plaintiffs filed a motion for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure which, if granted, would reinstate the provisions of the negotiated health benefits plan [18] The decision of whether to issue a preliminary injunction lies within the discretion of the district court. *CSX Transp., Inc. v. Tennessee State Bd. of Equalization,* 964 F.2d 548, 552 (6th Cir. 1992). When evaluating a request for a preliminary injunction, a court should consider (1) the plaintiffs' likelihood of success on the merits of the action, (2) any irreparable injury that could result to the plaintiff in the absence of an injunction, (3) whether the grant of an injunction would serve the public interest, and (4) the possibility that the injunction would substantially harm third parties. *Frisch's Restaurant, Inc., v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985); *In re De Lorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985); *Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 103 (6th Cir.1991). Fed.R.Civ.P. 52 requires a district court to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue. *In re De Lorean,* 755 F.2d at 1228.

### A. Likelihood of Success on Merits

■ For a proper resolution of the Plaintiffs' claims, the fundamental issue which must be resolved is whether they have a right to free lifetime health care benefits

from Massey–Ferguson, or, in the alternative, if Massey–Ferguson has a right to unilaterally modify the benefits in the collective bargaining agreements. The principal case relating to this issue in the Sixth Circuit is *International Union, United Auto., etc. v. Yard–Man, Inc.,* 716 F.2d 1476 (6th Cir. 1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). The specific question raised there was whether retiree health insurance benefits terminate at the expiration of the current collective bargaining agreement or whether they continue without abatement for the retiree's lifetime. The court declared that the intent of the parties to the collective bargaining agreement was dispositive. *Id.* at 1479.

According to the dictates of *Yard–Man,* a court must first look to the express provisions of the agreement and construe each section "consistently with the entire document and the relative positions and purposes of the parties." *Id.* at 1479–80. However, if the language in the agreement is ambiguous as to the term of the insurance, a court should look to other words and phrases within the document for guidance. *Id.* at 1480. If there is still uncertainty, the court should review other indicia of intent, such as the context in which the benefits arose. *Id.* The court noted that

> [b]enefits for retirees are only permissive, not mandatory subjects of collective bargaining. . . . As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations.

*Id.* at 1482 (citations omitted). It was also acknowledged that employees often accept retiree benefits in exchange for lower wages, despite the fact that they cannot rely on their union to maintain those benefits once they have retired and removed themselves from the bargaining unit. Thus, the court concluded that "finding an intent to create interminable rights to retiree insurance benefits in the absence of explicit language, is not, in

---

18. In three other cases that stem from Varity's modification of benefits, Judge Gadola granted the retirees' motions for preliminary injunctive relief which restored full benefits to the applicants during the pendency of their litigation. *See*

*Golden v. Kelsey–Hayes Co.,* 845 F.Supp. 410 (E.D.Mich.1994); *Helwig v. Kelsey–Hayes Co.,* 857, F.Supp. 1168 (E.D.Mich.1994) and *Hinckley v. Kelsey–Hayes Co.,* 866 F.Supp. 1034 (E.D.Mich.1994).

any discernible way, inconsistent with federal labor law." *Id. Yard–Man* sets the Sixth Circuit apart from other Circuits in that it recognizes an inference of interminable benefits where there is no language to the contrary:

> [R]etiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree. This is not to say that retiree insurance benefits are necessarily interminable by their nature. Nor does any federal labor policy identified to this Court presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent. Rather, as part of the context from which the collective bargaining agreement arose, the nature of such benefits simply provides another inference of intent. Standing alone, this factor would be insufficient to find an intent to create interminable benefits.

*Id.* (citation omitted).

Massey–Ferguson contests the validity of *Yard–Man,* claiming that (1) it carries very little weight, (2) the decision was based on a faulty analytical premise, (3) no other Circuit follows the *Yard–Man* rule, (4) it has been implicitly overruled by the Supreme Court, and (5) the Sixth Circuit has abandoned the reasoning in *Yard–Man.* (*See* Supplemental Response at 6–15.)

Specifically, Massey–Ferguson first contends that the inference from *Yard–Man* which suggests that benefits are likely to continue beyond the collective bargaining agreement has been greatly exaggerated. However, because other courts within this Circuit have followed the *Yard–Man* opinion, this argument does not affect the analysis by this Court. *See e.g., Smith v. ABS Indus., Inc.* 890 F.2d 841 (6th Cir.1989) (retiree benefits were vested); *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609 (6th Cir.1985) (obligation of provide retirees with certain health benefits did not end upon expiration of collective bargaining agreement), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986); *Weimer v. Kurz–Kasch, Inc.* 773 F.2d 669 (6th Cir.1985); *International Union, United Auto., etc. v. Cadillac Malleable Iron Co.,* 728 F.2d 807 (6th Cir.1984). Similarly, because the district courts in the Sixth Circuit are governed by the teachings of *Yard–Man,* Massey–Ferguson's next two arguments, which contest the validity of this case, are also without merit.

In support of its statement that *Yard–Man* has been implicitly overruled by the Supreme Court, Massey–Ferguson cites *Massachusetts v. Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989) (ERISA's vesting provisions do not apply to welfare benefit plans); *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 546–53, 108 S.Ct. 830, 834–38, 98 L.Ed.2d 936 (1988) (contractual obligation to make contributions to multi-employer benefit plan expired with collective bargaining agreement leaves district court without jurisdiction to compel contributions); and *Litton Financial Printing Div. v. NLRB,* 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) (in general, contractual obligations cease upon termination of the bargaining agreement; exceptions are determined by contract interpretation, and vested rights generally survive termination of agreement). None of these cases appear to effect the validity of the *Yard–Man* analysis. As an example, *Morash* is not helpful because *Yard–Man* does not rely upon an interpretation of ERISA in its reasoning. Similarly, *Advanced Lightweight Concrete Co.* does not address the question of contract interpretation. In *Litton,* the court clearly stated that vested rights can survive the termination of an agreement, and an interpretation of the contract can reveal whether contractual obligations extend beyond the termination of a bargaining agreement. 190 U.S. at 207, 23 S.Ct. at 787.

Not only is Massey–Ferguson's assertion, that subsequent Supreme Court decisions have invalidated *Yard–Man,* incorrect but its contention that this case is no longer followed by the Sixth Circuit Court of Appeals is also a misrepresentation. Massey–Fergu-

son's primary support for this statement is *Cincinnati Typographical Union No. 3 v. Gannett Satellite Info. Network, Inc.,* 17 F.3d 906, 911 (6th Cir.1994). Massey–Ferguson declares:

> [Here,] the Court followed *Litton,* rejected a claim of vested rights that was not supported by explicit vesting language in the collective bargaining agreement, displayed a correct understanding of the term "accrued" as referring to rights that accrue, increase and vest over time, and affirmed summary judgment in favor of the employer. In all these respects [this case] is inconsistent with *Yard–Man* .... It therefore appears that the Court no longer follows *Yard–Man.* This Court should lay *Yard–Man's* ghost to rest once and for all....

(Supplemental Response at 14.) Contrary to Massey–Ferguson's proclamation, the *Cincinnati Typographical Union* court merely relied upon *Litton* for guidance as to whether a post contract expiration dispute arises under a contract and must be arbitrated—an issue that is not relevant to this dispute. In fact, *Cincinnati Typographical Union* actually cites *Yard–Man* for the proposition that a court must use the standard principles of contractual interpretation to determine if a right is vested. 17 F.3d at 910. Moreover, *Cincinnati Typographical Union* makes it clear that *Yard–Man* is not dead, referring to it for the proposition that

we might conclude the parties intended a right to vest if we are shown contract language or extrinsic evidence to support that conclusion.

*Id.* at 910. Finally, Massey–Ferguson's implication, that *Cincinnati Typographical Union* only stands for the proposition that those rights which can be worked toward or accumulated over time are vested, is also incorrect. While the *Cincinnati Typographical Union* court does recognize that accumulated rights are a form of vested rights, it declares that this is the second basis upon which rights can be vested. The first basis exists where the parties intended such vesting. *Id.* at 910–11. Accordingly, *Yard–Man* remains the law which must be applied in this case [19]

■ Therefore, in determining the intent of the parties, the Court must first look to the explicit language contained within the agreement for guidance.[20] *Yard–Man,* 716 F.2d at 1480. In relevant part, the agreement in this case provides:

> Cost of Coverage. Except as otherwise provided in this agreement, the company shall pay the full cost (including any increases in cost) of Benefit Coverage for eligible employees, pensioners and dependents, and survivors of employees or pensioners ...
>
> ...
>
> Pensioner. A former bargaining unit employee: (1) who is retired from employment with the company and who is re-

**19.** In an additional supplemental pleading, Massey–Ferguson cites a recent decision by the Supreme Court, *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) for the proposition that (1) *Yard–Man* is obsolete, and (2) it has the statutory right to unilaterally modify its welfare benefit plans to reduce health benefits provided to retirees. However, the question before the Supreme Court was whether the amendment procedure, which had been described in the summary plan description, was legally sufficient under § 402(B)(3) of ERISA. The district court had already determined that the company, which had voluntarily instituted a welfare benefit plan for non-union retirees, was not contractually bound to provide lifetime health benefits. *Curtiss–Wright* is inapposite to this controversy, in that it neither addresses a plan which was developed as a result of a collective bargaining agreement, nor discusses any of the substantive issues that are relevant to

this case. In summary, it does not refute the validity of *Yard–Man.*

**20.** At all times relevant to this action, every collective bargaining agreement between Massey–Ferguson and a UAW local consisted of several portions, including (1) a basic agreement with a specified duration which set forth the terms and conditions of employment, (2) a pension agreement of the same duration, (3) an insurance agreement of the same duration, and (4) an agreement between Massey–Ferguson and the insurance company. At issue in this case is the insurance agreement which, among other things, described the employees' and pensioners' welfare benefits and prescribed their eligibility and contribution requirements. The insurance agreements have been the same in all relevant respects since the early 1960s. For simplicity, all references to the insurance agreement will be directed to the agreement of March 10, 1980.

ceiving or is entitled to receive a current pension; (2) whose seniority is or was broken at or after age sixty-five (65) and after December 1, 1964, for a reason other than discharge for cause and who is not eligible to receive a pension.

Insurance Agreement at §§ 6.02, 7.01(i). The 1985 Memorandum of Agreement,[21] in § 7, provides that "such benefits shall continue to be provided if the normal eligibility requirements are met."[22] Thus, the health care benefits are tied to an entitlement for a pension, other than a vested deferred pension. For surviving spouses of pensioners, there is a similar provision. In a recent action brought against the same corporation pursuant to the same conduct which has been challenged here, this connection has been held to lend support to a claim for the interminability of benefits. *Golden v. Kelsey–Hayes Co.*, 845 F.Supp. 410, 415 (E.D.Mich. 1994).

Both parties admit that the 1985 Memorandum of Agreement is somewhat ambiguous as to its duration. However, Massey–Ferguson contends that the durational clauses in the collective bargaining agreement (providing that the "insurance agreement shall remain in full force and effect without change through October 31, 1982") permit the termination of health benefits for retirees upon its expiration. In *Golden*, in response to an identical argument, the court declared that the "Sixth Circuit has found that such routine durational clauses do not outweigh the implication that retiree health benefits were intended to outlast the life of a particular bargaining agreement." 845 F.Supp. at 414 (citing *Yard–Man*, 716 F.2d at 1482–83; *Schalk v. Teledyne, Inc.*, 751 F.Supp. 1261 (W.D.Mich.1990), *aff'd*, 948 F.2d 1290 (6th Cir.1991)). The court in *Golden* concluded that "such [duration] provisions only refer to the length of the agreement and not the period of time contemplated for retiree bene-

fits." *Id.* Here, as in *Golden*, the provisions cited by Massey–Ferguson refer to the expiration of the collective bargaining agreement. Massey–Ferguson has not referred the Court to any provision that specifically limits the term of any specific benefits. *See id.* at 415.

Massey–Ferguson next argues that the integration clause contained in every insurance agreement with the UAW ("[T]his agreement shall, effective the Monday following ratification, amend and supersede the plans of insurance benefits set forth in any and all agreements or supplemental agreements between the company and the union with respect to the [Metro Detroit, Racine, and Des Moines facilities]") bars the benefits from being interminable. This argument clearly has no merit. Where there has been no execution of an additional agreement, presumably there is no integration clause to supersede the last agreement.

Massey–Ferguson also argues that "the 'normal eligibility requirements' to which the 1985 Memorandum refers includes three coordination of benefits provisions, belying any claim that it is obligated to pay the full cost of benefits for life, because the Insurance Agreement provided that the Company would pay the cost of benefits 'except as otherwise provided in this Agreement.'" The Agreement otherwise provides for the coordination of benefits so that if an individual is covered by more than one plan (e.g., Medicare), the benefits are reduced so as to avoid duplication of coverage. However, it is unclear that this provision is inconsistent or irreconcilable with an agreement to ensure full coverage for life. Depending on the other plan under which the retiree is covered, this provision simply reduces the cost to Massey–Ferguson. This appears to have no connection to the duration of Massey–Ferguson's coverage.

---

**21.** This Agreement by its terms does not apply to Albright, Poulsen, or Stanton of the subclasses whom they purport to represent. *See* Memorandum of Agreement at §§ 4, 7. However, inasmuch as it exhibits a manifestation of Massey–Ferguson's intent to provide retiree health care benefits subsequent to the termination of the collective bargaining agreements, this ideology may be applied to all of its retirees.

**22.** Because the 1985 Memorandum of Agreement does not define "normal eligibility requirements" or "such benefits," the Court must look to the Insurance Agreement for an answer to these two questions.

Massey-Ferguson next claims that § 6.04 of the Agreement allows it to modify retiree benefits at will. Massey–Ferguson's argument must be rejected. The section provides that if statutory benefits become available, the company

> shall, to the extent it finds it practicable, provide benefits supplementary to those provided under law to the extent necessary to make total benefits as nearly comparable as practical to the benefits under this agreement.

Based upon its plain language, this provision merely expresses an intent by Massey–Ferguson not to allow duplicate recovery and gives the company the option of providing only the contractual benefits above and beyond those that are statutorily available. Thus, it is irrelevant that more than eighty percent of the pensioners and dependents currently receive statutory benefits of the same general type in the Agreement.

Therefore, because the language contained in the agreements creates an ambiguity, the Court shall review extrinsic evidence in an effort to discern the parties' intent. *Yard–Man,* 716 F.2d at 1480. The Plaintiffs have submitted an affidavit from Jack Derry, a former representative for UAW Local 256 at an Massey–Ferguson plant in Detroit. He was present when, on several occasions, Massey–Ferguson's benefit representatives informed retiring employees that they had lifetime health care benefits. (Derry Affidavit at ¶ 12.) In addition, the Plaintiffs claim that the bargaining notes, which were recorded on February 6, 1985 prior to the execution of the parties' Memorandum of Agreement, indicate that it was Massey–Ferguson's intention to provide lifetime benefits. They assert that the UAW demanded a specific written assurance that the benefits be termed lifetime because the parties had "both agreed that benefits would be there" and the "term lifetime [is] not in writing." (See Reply at 22.) In addition, they note that the language drafted by Massey–Ferguson for the relevant section of the Memorandum appears under a heading entitled "lifetime benefits for retirees." (Reply at 23.)

The Plaintiffs next submit the testimony of Manfred Bittkau, the chief benefits manager for Massey–Ferguson until 1969, who was involved in the 1964 negotiations when his Company agreed to pay the full cost of retiree health care benefits. (Bittkau Dep. at 18, 26.) He testified that "[i]t was always the understanding [of Massey–Ferguson] that these benefits were not only negotiated but in the mind of the Company[,] provided for those pensioners for life ... it wasn't just something that was dragged out of [the company] and we made a point of telling our pensioners so." *Id.* at 27.

The Plaintiffs contend that Massey–Ferguson reflected its position on this issue when it continued to pay benefits to the retirees after its plants closed and the Master Agreement had terminated.[23] The record tends to support this assertion. Massey–Ferguson continued to provide health care benefits to all of its bargaining unit retirees and their surviving spouses without interruption after the plant closing and the negotiated termination of the Master Agreement in February, 1985.

Finally, the Plaintiffs have produced several letters which ostensibly support their contention that they will succeed in this action. Approximately fifty-eight letters were sent to surviving spouses of hourly retirees between

---

**23.** Massey-Ferguson entered into Master Agreement with the UAW and several of its locals, including UAW Locals 174, 256, 1446, and 1505 which applies to plants in Detroit, Michigan, Des Moines, Iowa, and Cuyahoga Falls, Ohio. Massey–Ferguson also had a separate collective bargaining agreement with the UAW and its Local 244 that applied to its Racine employees. However, until 1985, there was only one Agreement which covered all of the Massey–Ferguson employees who were represented by the UAW.

On February 7, 1985, Massey–Ferguson and the UAW entered into a Memorandum of Agreement in which they agreed that the Master Agreement expired on October 31, 1984, even though they extended the Racine employees' agreement through October 31, 1985 and renewed the economic provisions of the Agreement for the Des Moines warehouse unit through 1985. As to the units, including those facilities in Detroit and Wayne, Michigan which had been closed, the parties agreed that those employees who were laid off on or before October 31, 1984 would continue to be covered by the provisions of the Agreements, "provided they satisfy the normal eligibility requirements and have not drawn their payment under the Dislocation Benefit Plan...."

1983 and 1989 by Massey–Ferguson benefits administrators and a human resource administrator. These letters (1) generally detailed the amount of available pension benefit that would be provided to them under the "hourly pension plan" and (2) indicated that Massey–Ferguson would continue their "health, dental, vision and hearing aid benefit coverage for the rest of [their lives] at no cost to [the survivor]."

On their face, the letters clearly indicate an intent to provide the benefits for a lifetime. However, Massey–Ferguson claims that these letters were sent by mistake, and present an affidavit to that effect. The fact that these letters were sent over a seven year period by several different employees lends credence to the Plaintiffs' argument that they reflect Massey–Ferguson's intention to provide lifetime benefits to its retirees and their surviving spouses. In addition, Massey–Ferguson's own interpretation of its obligations, such as its initial determination that benefits could not be unilaterally altered for retirees, evidences an intention to provide lifetime benefits. *See* Reply at 17.

Massey–Ferguson challenges these findings by asserting that any agreement for a plan to survive termination of employment or the collective bargaining relationship must be included in the written terms of the agreement because of the statute of frauds, and in the absence of such an express written provision, the employer may unilaterally modify or terminate benefits for its employees, former employees, or retirees. However, this argument runs contrary to the law of the Sixth Circuit in *Yard–Man*.

Moreover, Massey–Ferguson's citation of *Laborers Health & Welfare Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 548–49, 108 S.Ct. 830, 835–36, 98 L.Ed.2d 936 (1988) (contractual obligation to make contributions to benefit plan expired with collective bargaining agreement) does not apply in this case as there was arguably a contrary intent exhibited by the employer. Indeed, Massey–Ferguson concedes that in the Sixth Circuit, there is some distinction in that the Plaintiffs are collective-bargaining retirees. (*See* Response at 9.) Likewise, Massey–Ferguson's assertion (to wit, the

1985 Memorandum of Agreement did not specify how long the benefits would continue) merely restates its earlier argument that the Plaintiffs must provide evidence of the parties' intention outside the written agreement. Accordingly, the Plaintiffs have presented a relatively strong likelihood of success on the merits of their claim for lifetime retiree health care benefits. There are no express provisions of the collective bargaining agreements which limit the duration of the benefits for retirees. The Memorandum of Agreement provides that eligibility for retirement health benefits is linked to the normal eligibility requirements, which are, for example, the entitlement to a current pension benefit for retirees. Subsequent to the expiration of the collective bargaining agreements and sale of the various Massey–Ferguson divisions, Massey–Ferguson continued to pay the cost of retiree benefits until the current action (with the exception of the attempted change in the prescription plan in 1990). Moreover, Massey–Ferguson's conduct (i.e., transmittal of letters to surviving spouses of retirees) supports the Plaintiffs' claim that their benefits had vested. In addition, Jack Derry, a representative for UAW Local 256 at Massey–Ferguson's plant in Detroit, states that the retiree insurance benefits were intended to be lifetime benefits extending beyond the termination of the collective bargaining agreement. This claim is further supported by a letter, in which he stated that the Memorandum "represents the parties' historic application and intent that such coverage is for the lifetime of the retiree, dependent and surviving spouses...." This evidence supports the Plaintiffs' assertion that the health benefits are intended to last for their lifetimes without modification. Accordingly, the inference established in *Yard–Man* presents a likelihood that the retiree health benefits are interminable and the Plaintiffs are likely to prevail on the merits.

**B.** *Irreparable Harm*

A specific finding of irreparable injury to the movants is the single most important element which the court must examine when evaluating a motion for a preliminary injunction. *Los Angeles v. Lyons*, 461

U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983) (remedy of preliminary injunction is unavailable absent showing of irreparable injury); *MetroBanc v. Federal Home Loan Bank Bd.*, 666 F.Supp. 981, 984 (E.D.Mich. 1987); *Reuters Ltd. v. United Press International, Inc.*, 903 F.2d 904, 907 (2nd Cir.1990). Indeed, the Sixth Circuit has stated

> this court has never held that a preliminary injunction may be granted without any showing that the plaintiff would suffer irreparable injury without such relief. Despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required such irreparable harm before an interlocutory injunction may be issued.

*Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102–03 (6th Cir. 1982) (citations omitted). In order to show irreparable injury, the moving party must exhibit a non compensable injury for which there is no legal measure of damages. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E.F. Hutton & Co.*, 403 F.Supp. 336, 343 (E.D.Mich.1975) (citations omitted). Any such harm must be "actual and imminent," and not merely remote or speculative. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2nd Cir.1989). Moreover, it is an abuse of discretion for a district court to grant a preliminary injunction without making specific findings of irreparable injury to the party who seeks the injunction. *Friendship Materials*, 679 F.2d at 105.

The Plaintiffs support their claim for injunctive relief by asserting that they will suffer an irreparable injury if they forced to forgo medical treatments because of their inability to make co-payments. In support of their claim, the Plaintiffs have submitted several affidavits which detail the impact of the changes in their health care benefits.

In its opposition papers, Massey–Ferguson argues that the Plaintiffs' delay in bringing this motion is clear evidence that they have not, and will not, sustain an irreparable injury. Moreover, Massey–Ferguson contends that the Plaintiffs have not (1) submitted affidavits which support their contention that anyone would fail to seek medical care due to co-payments and/or deductibles, or (2) made any effort to show that the injuries of Fox or Noe, for which there are affidavits, are typical of the class members. Finally, Massey–Ferguson asserts that the Plaintiffs will not sustain any irreparable injury because the health care providers will write off any co-payment amount for which they are not reimbursed.

Other courts have found that a reduction in insurance coverage constitutes an irreparable harm and merits a preliminary injunction. *See United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6 (1st Cir.1987) (retirees have less resources and are generally more vulnerable to emotional distress when additional insurance costs are imposed); *Schalk v. Teledyne, Inc.* 751 F.Supp. 1261 (W.D.Mich.1990) (small increases in expenses create extreme financial hardship and increased anxieties for retirees living on fixed incomes), *aff'd*, 948 F.2d 1290 (6th Cir.1991). In three cases involving the same company and similar facts, the Court found irreparable injury. *See Hinckley v. Kelsey–Hayes Co.*, 866 F.Supp. 1034, 1044 (E.D.Mich.1994); *Helwig v. Kelsey–Hayes Co.*, 857 F.Supp. 1168, 1179–80 (1994); *Golden*, 845 F.Supp. at 415.

Here, due to the nature of the harm, the threat of injury is ever present. Although the Plaintiffs did not suffer an immediate irreparable harm upon the implementation of the new benefits plan, there is no indication that there is any less exposure to such an injury in the future if the injunction is not granted. Thus, in reliance upon the rationale in *Golden*, *Hinckley*, and *Helwig*, the Plaintiffs have met their burden of establishing irreparable harm.

### C. *Public Interest*

ERISA and the LMRA favor the protection of those rights of employees which have been granted by collectively bargained welfare benefit plans. ERISA was initially enacted by Congress "to protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by providing for appropriate remedies, sanctions, and ready access to the Federal Courts." 29 U.S.C. § 1001(b). The LMRA was enacted to en-

courage collective bargaining and to protect the freedom of workers to designate representative of their own choosing for the purpose of negotiating the terms and conditions of their employment or protection. 29 U.S.C. § 151. In *Schalk*, 751 F.Supp. at 1268, the court indicated that the "public interest lies in protecting the legitimate expectations of retirees that their health insurance will be provided for the rest of their lives." Here, the public interest favors the issuance of a preliminary injunction.

### D. *Harm to Others/Balance of Harm*

If Massey–Ferguson is required to reinstate health care benefits· at the previous levels, it will suffer a financial loss of approximately $111,000 per month. Massey–Ferguson has made no showing that requiring it to reinstate the old plan would cause severe financial hardship. Its singular claim is that Massey–Ferguson is solely in the business of administering benefit plans. It submits that any damages which flow from an improperly placed injunctive order can only be drawn from future reductions in welfare benefits for the Plaintiff class.

Therefore, in assessing the relative harms to the respective parties, this Court concludes that the prejudice to Massey–Ferguson through the granting of an injunction is substantially less than the injury to the Plaintiffs if their application for injunctive relief is denied.

### E. *Security Bond*

Fed.R.Civ.P. 65(c) provides that no "preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered" by the defendant. Thus, district courts should consider the question of bond before issuing a preliminary injunction. Here, Massey–Ferguson estimates that it will suffer a financial loss of approximately $111,000 per month if it is required to reinstate benefits at the level provided prior to the January 1994 change. The issue of a security bond has been addressed in several similar cases, and the court has generally required a bond less then

the defendant's representation of its monthly loss. *See Schalk*, 751 F.Supp. at 1269 ($50,-000 bond required where defendant claimed that cost to maintain old health plan was $90,000); *Golden*, 845 F.Supp. at 417 (injunction would allegedly cost company $160,000 per month; court required $100,000 bond); *Hinckley*, 866 F.Supp. at 1046 ($87,000 loss claimed if injunction entered, and court required $55,000 bond); *Helwig*, 857 F.Supp. at 1181 (in light of $150,000 per month loss by defendant, court required bond of $95,000). Under the circumstances of this case and given the burden that is placed on Massey–Ferguson, the Plaintiffs must post a bond of $60,000 as a prerequisite to the issuance of a preliminary injunction.

### V

Accordingly, upon the posting of a $60,000 bond by the Plaintiffs, Massey–Ferguson shall immediately reinstate the health care benefit plans that were in effect prior to January 1, 1994 for those retirees who are represented in this action.

IT IS SO ORDERED.