STATE ex rel. UNION PLANTERS BANK, N.A. et al., Relators,

v.

The Honorable Larry L. KENDRICK, Judge of the Circuit Court of St. Louis County, Missouri, Respondent.

No. SC 85473.

Supreme Court of Missouri, En Banc.

Aug. 24, 2004.

Motion to Modify Denied Sept. 28, 2004.

John C. Rasp, Michael A. Clithero, Geoffrey G. Gerber, Brian R. Plegge, Carrie A. Wrisberg, Robyn G. Fox, Frank Susman, Kenneth B. Newman, Andrew D. Dillon, Martin M. Green, David T. Butsch, Allen P. Press, St. Louis, MO, for Relators.

Gerald P. Greiman, Daniel V. Conlisk, Patrick T. McLaughlin, St. Louis, MO, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

Relators seek a writ of prohibition ordering Respondent to de-certify the class in the underlying matter. Relators allege that class counsel cannot adequately represent the members of the class because class counsel accepted funds from potential defendants to finance the lawsuit only against other parties, with an "implicit understanding" that class counsel would not sue them. Additionally, two of the class representatives are or have ties to these potential defendants.

A preliminary writ of prohibition was granted, which is now made absolute as modified.

## I. Background

### 1. Factual allegations

This lawsuit involves allegations by individuals who purchased a series of bonds issued by the Arch Leasing Corporation Trust ("the Trust"). The Trust was organized by the principals of St. Louis Leasing Corporation ("SLLC"), with the assistance of Jerry Liss, the principal owner of J.E. Liss & Company, Inc., an investment banking and brokerage firm ("Underwriter"), to issue up to $50 million worth of bonds to raise money for SLLC's operations.

Bond proceeds were to be used to pay for a part of the purchase price of new computers that were then to be leased to large companies for varying periods of time. The other part of the purchase price was to be paid for using funds borrowed from various banks. The lease payments were to be used to repay the funds from the banks and some of the interest due on the bonds. SLLC actually oversaw the purchase of the computers and marketed them to the lessees.

The bondholders were only to receive interest payments for three years, after which the principal was to be paid in full. The money for the principal payoff was to come from the "residual value" of the computers. Marshall & Stevens, Inc., was to provide an appraisal or estimate of the residual value of the computers as each lease was entered into.

Magna Bank (now Union Planters Bank, "UPB") was the indenture trustee. UPB's duties, prior to default, were to act as the paying agent. Delaware Bank was the statutory trustee. Arch Leasing Corporation ("Arch"), an affiliate of SLLC that shared its offices and personnel, was the managing trustee with day-to-day responsibility for collecting the bond proceeds, paying them out, and generally handling the business affairs of the Trust.

Purchasers of the bonds signed a subscription agreement with their broker, gave their broker a check for the face amount of the bonds, and then the money was sent to an escrow agent. Throughout, there were to be periodic closings at which the Trust was to deliver certain opinions from its officers, Robert Chlebowski and Lynne Frownfelter, and its counsel, Doster and Doster, P.C., to Underwriter. R. Philipp, of Krantz & Philipp ("Underwriter's counsel"), was also required to give certain opinions at each closing, including an opinion as to whether the Prospectus for the bonds had any false or misleading statements in it. After each closing, the escrow agent sent the money to Arch, and UPB was directed to issue the bonds. The Trust issued $14,011,000 in bonds in fifteen increments between May 19, 1995, and November 30, 1995.

Plaintiffs allege that, during 1995, Arch allowed SLLC to use up to $3.6 million of the bond proceeds for purposes other than the purchase of computers. Plaintiffs claim that use of this money by SLLC was an event of default under the indenture of trust, making any issuance of additional bonds improper until the situation was corrected. Plaintiffs also allege that Underwriter's counsel called the UPB officer handling the account and informed him that the financial statements showed that monies were being improperly used by SLLC, though suit was not filed against him. Nonetheless, the Trust issued $8,995,000 worth of bonds after July 1995.

Plaintiffs further allege that Doster & Doster, P.C., continued to give opinions that the financial statements did not contain any fraudulent or misleading information in spite of its knowledge of the diversion of funds. Finally, plaintiffs allege that UPB, with knowledge of the diversion

of funds, continued to participate in the issuance and sale of the additional bonds, in breach of the indenture of trust.

In the last half of 1995, SLLC's financial condition worsened, and on January 2, 1996, SLLC filed for bankruptcy. The first bonds were to have been paid off on May 19, 1998, but the Trust had insufficient funds to do so. Consequently, the Trust filed suit to compel UPB to distribute available funds to all bondholders on a pro rata basis (the 1998 Action). UPB sold all the collateral and continued to make payments to the bondholders after the default. The 1998 Action was concluded in 2002, and the court discharged UPB from further duties as indenture trustee.

2. *The initiation of the class action lawsuit*

In August of 1998, David Bax, William Glaser, and William Myers, brokers for certain bondholders (hereinafter "the brokers"), initially hired Gerald P. Greiman to represent them in objecting to the sale of collateral in the 1998 Action. The firm's fees were paid out of a $20,000 retainer that was provided exclusively by the brokers.[1]

On December 18, 1998, the brokers and Liss met with Greiman to hire his firm

("Class Counsel") to investigate the possibility of filing a class action on behalf of the bondholders. The initial exploration into the possibility of suit was funded by the remainder of the $20,000 retainer the brokers had paid in the 1998 Action. Underwriter and the brokers agreed to loan an additional $100,000, $60,000 of which came from Liss, to retain Class Counsel to pursue the class action.[2] Underwriter and the brokers provided assistance to Class Counsel in piecing together the facts about the alleged wrongdoing in the bond transaction, and consequently, an "implicit understanding" arose that Class Counsel would not pursue any claims against Underwriter or the brokers on behalf of the bondholders. At that point, the firm had no clients to form the class, and no bondholders were consulted about the agreement.[3]

After the issue of funding was resolved, the brokers began to assist Class Counsel in identifying bondholders who might be interested in serving as class representatives. The first official engagement letter concerning the instant matter was not sent until July 6, 1999. That letter was sent to several potential class representatives, including Norma Ducommun, Susan Deuver, Dorothy Earle, East Maine Baptist

---

1. At that time, Greiman was a member of Dankenbring Greiman & Osterhold, LLP, which merged with Spencer Fane Britt & Browne LLP, effective January 1, 2001.

2. There are two ways to look at the facts and the motives of the underwriters and brokers. The charitable way is to consider that these persons sold bonds to various investors, including members of their own families, and were troubled when the recipients of the bond proceeds diverted the proceeds to unauthorized purposes. To make their clients whole, they hired a lawyer to sue the defendants who they believed cheated the purchasers of the bonds.

The less charitable interpretation is that, when the underwriter and brokers became

aware of the diversion of the bond proceeds, they believed they were likely to be sued and hired a lawyer to represent the class against the (other) potential defendants with the understanding that the underwriter and brokers would not be sued regardless of their potential culpability.

3. Class Counsel had sent a letter in September 1998 to Donald R. Glaser, one of the bondholders Class Counsel represented in the 1998 Action, offering an analysis of any potential class action claims, but there is no evidence that he accepted the offer or attempted to retain Class Counsel to pursue a class action suit at that time.

Church, Rona Hodes, Penny Hogfeldt and Anthony D'Agostino of Commercial Mortgage and Finance Company, John Schultheis, and Gary and Jeane Yamine.

Hodes had a Series 6 NASD license that was held by Underwriter, received commissions from the sale of the bonds, was employed by Underwriter as a registered representative and broker during the period at issue in the lawsuit, and is part of the group of brokers Class Counsel agreed not to sue.

The initial engagement letter stated, in relevant part:

> At the outset of our representation, certain bondholders, as well as certain brokers involved in selling the bonds, have contributed to a fund to pay certain of our fees and expenses as set forth above. That fund aggregates $120,000.
>
> . . . .
>
> While the funding third parties will not be our clients, we expect to obtain ongoing assistance from them in pursuing your claims. Accordingly, it may be necessary at times to share privileged or otherwise confidential information with them, and we assume we have your approval to do so. Similarly, in light of the ongoing assistance we anticipate, as well as the funding they have contributed, we will not be in a position to consider or pursue any potential claims against any such parties or any entity with which any of them is affiliated. We assume this meets with your approval as well.

The letter advised potential class members that they were free to obtain independent counsel to investigate claims against Underwriter and/or the brokers, but noted that the "fees and expenses associated with individual bondholders retaining their own separate counsel could be quite substantial." Finally, the letter asked potential plaintiffs to approve an arrangement whereby, in the event of any recovery, the unidentified persons who contributed to "the fund" would be reimbursed for their contributions first, before any recovery would be distributed to the class.

After the first engagement letter was sent, Class Counsel had telephone conversations with Gary Yamine and Hodes, during which Liss was discussed "in some disparaging context." On October 6, 1999, Class Counsel sent a second engagement letter to the same individuals, which stated:

> As stated in the engagement letter [of July 6, 1999], we are not in a position to consider or pursue any claims against various brokers involved in selling the bonds, including but not limited to J.E. Liss & Company, Inc., as they are assisting with this case and have provided some of the funding for it.

The letter also alluded to a class action filed in Wisconsin against Underwriter, but did not indicate that the class action concerned a different transaction than the bond sale at issue in the present matter. Commercial Mortgage & Finance Company, Ducommun, Duever, Earle, East Maine Baptist Church, Hodes, Schultheis, and the Yamines initially agreed to serve as the named plaintiffs and class representatives.

### 3. Procedural history of the lawsuit

This lawsuit was filed as a class action in November 1999. The Yamines dropped out of the suit when Relators sought to take their deposition. Subsequently, a second amended class action petition was filed, in which Donald R. Glaser was added as a named plaintiff and class representative. Glaser had purchased his bonds from his son, William Glaser, who is one of the brokers who initially hired Class Counsel and is part of the group of brokers that Class Counsel agreed not to sue. These plaintiffs ("Plaintiffs") then made a

motion for class certification on June 16, 2000. Relators objected to class certification, alleging class counsel had a conflict of interest due to his relationship with Underwriter and the brokers. Prior to and during the class certification process, some of the named defendants also filed third party defendant claims against Underwriter and Red Oak Financial, one of Underwriter's affiliates, but no claims were filed against the brokers.[4] After extensive discovery and three evidentiary hearings, the trial court entered an order certifying the class on May 12, 2003. At that time, Respondent directed that the "relevant circumstances" regarding Class Counsel's understanding with Underwriter and the brokers be "fully disclosed" in the notice to the class, and that "any class member who may disagree with the strategic decision made by the class representatives and plaintiffs' counsel may elect to opt out of the class." Relators subsequently filed petition for a writ of prohibition in this Court.

## II. Standard of Review

 "Determination of whether an action should proceed as a class action under Rule 52.08 ultimately rests within the sound discretion of the trial court." *State ex rel. Am. Family Mut. Ins. Co. v. Clark*, 106 S.W.3d 483, 486 (Mo. banc 2003) (citing *Ralph v. Am. Family Mut. Ins. Co.*, 835 S.W.2d 522, 523 (Mo.App.1992)). However, if the trial court abuses its discretion in certifying a class, "prohibition may be appropriate to prevent unnecessary, inconvenient, and expensive litigation." *See State ex rel. Linthicum v. Calvin*, 57 S.W.3d 855, 857 (Mo. banc 2001).

**4.** Underwriter's motion to dismiss the third party claims was overruled May 10, 2003.

**5.** Because Missouri's Rule 52.08 and Federal Rule 23 parallel, federal interpretations of Rule 23 may be considered in interpreting

## III. Analysis

### 1. Class actions in general

 Rule 52.08 governs class action proceedings. A class action is designed to promote judicial economy by permitting the litigation of the common questions of law and fact of numerous individuals in a single proceeding. *Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979); *Fox v. Massey–Ferguson, Inc.*, 172 F.R.D. 653, 660 (E.D.Mich.1995).[5] Because a class action determines the rights of absent class members, Rule 52.08(a)(4) requires, as a prerequisite to class certification, that the trial court find the representative parties will fairly and adequately protect the interests of the class. *Clark*, 106 S.W.3d at 486. This prerequisite applies both to the named class representatives and to class counsel. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Culver v. City of Milwaukee*, 277 F.3d 908, 913 (7th Cir.2002). In evaluating the adequacy of representation, courts determine whether class counsel or the named representatives have conflicts of interest that will adversely affect the interests of the class. *City of Excelsior Springs v. Elms Redev. Corp.*, 18 S.W.3d 53, 59–60 (Mo.App.2000); *Davis v. Comed, Inc.*, 619 F.2d 588, 593–94 (6th Cir.1980); *Stavrides v. Mellon Nat'l Bank & Trust Co.*, 60 F.R.D. 634, 636 (W.D.Pa.1973). "This requirement is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the

Rule 52.08. *Koehr v. Emmons*, 55 S.W.3d 859, 864 n. 7 (Mo.App.2001); *State ex rel. Byrd v. Chadwick*, 956 S.W.2d 369, 378 (Mo. App.1997).

named plaintiff." *Key v. Gillette Co.,* 782 F.2d 5, 7 (1st Cir.1986) (internal citations omitted).

### 2. The basic law of conflicts of interest

■ An attorney has a duty of loyalty to his client. A conflict of interest is "any substantial risk that a lawyer's representation of a client would be materially and adversely affected because of the lawyer's countervailing interests or duties." Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* sec. 10.7 (3d ed. Supp.2004). Consequently, attorneys have a duty to avoid representation of clients when that representation may be affected due to the attorney's relationship to other parties. This is because, "when a lawyer is laboring under this kind of conflict of interest, the conflict in effect forecloses alternatives that would otherwise be available to the client." *Id.* at sec. 11.8 (quoting Model Rules of Prof'l Conduct Rule 1.7(a)(2) cmt. 8 (2002)).

■ In Missouri, this concept is governed by Rule 4–1.7, which states:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client *or to a third person,* or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) each client consents after consultation.

(emphasis added). When a conflict of interest arises that may materially limit the lawyer's representation of the client, the rule provides that the conflict may nonetheless be cured, in certain circumstances, by the informed consent of each client. However, when "it is not reasonably likely that the lawyer will be able to provide adequate representation to one or more of the clients," the conflict can not be cured by consultation and consent. Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* sec. 10.8 (3d ed. Supp.2004) (citing *Restatement of the Law of Lawyering* sec. 122 (2000)). That is, "[w]here … loyal and diligent service cannot be provided to each affected client, then consent should not be sought." *Id.* As was stated in *In re Snyder,* "Some conflicts of interest are considered to compromise the client's interests per se and are strictly prohibited." 35 S.W.3d 380, 383 (Mo. banc 2000).

Rule 4–1.8 specifically addresses the potential conflict of interest that may arise when a third party is paying the attorney to represent the client:

(f) A lawyer shall not accept compensation for representing a client from one other than the client unless:

(1) the client consents after consultation;

(2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and

(3) information relating to representation of a client is protected as required by Rule 1.6.

As with Rule 4–1.7, this rule provides that potential conflicts of interest due to a third party funding the litigation may be cured under certain circumstances. If the lawyer's exercise of his or her independent professional judgment and the client-lawyer relationship are preserved, and the client's confidences are maintained as per Rule 1.6, then the attorney may seek the informed consent of each client to waive the conflict. However, as with Rule 4–1.7, consent should not even be sought if any of

these conditions cannot be met.[6]

### 3. Class Counsel's conflict

The conflict of interest suffered by Class Counsel is clear. Class Counsel accepted a substantial amount of money from potential defendants to initiate a class action lawsuit only against other defendants. Class Counsel was and is not able to exercise independent professional judgment on behalf of the class in considering whether a claim should be asserted against Underwriter and/or the brokers.

The underlying facts are complex. The second amended petition contains sixteen counts against six defendants. Several of the defendants have filed third party claims. Simply stated, the lawsuit alleges claims against the existing defendants concerning the misuse of bond monies and continued bond sales thereafter. Plaintiffs specifically allege that Underwriter's counsel had knowledge of the alleged misuse, informed other defendants of the misuse, but that bonds continued to be sold.

Class Counsel realized that a potential claim might be asserted against Underwriter and/or the brokers but did not investigate or consider any such claim against Underwriter and/or the brokers "in light of the ongoing assistance we anticipate, as well as the funding they have contributed." This arrangement was made prior to Class Counsel being retained by any member of the class.

This arrangement does not comply with Rule 4–1.7 or Rule 4–1.8. Rule 4–1.7 prohibits representation of a client that "may be materially limited by the lawyer's responsibilities to another client or to a third person or by the lawyer's own interests, unless: (1) the lawyer reasonably believes the representation will not be adversely affected...." It is impossible for Class Counsel to satisfy this condition because the engagement letter acknowledges that class counsel would "not be in a position to consider or pursue" claims against the funding parties who are potential defendants in the action.

Similarly, Rule 4–1.8 prohibits an attorney from accepting compensation from third parties unless "there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship." Again, Class Counsel's letter clearly reflects the inability to exercise independent professional judgment regarding the assertion of claims against Underwriter and/or the brokers who have contributed to the fees and expenses of the lawsuit.

Class Counsel maintains that the named representatives and the members of the class are counsel's only clients, not Underwriter or the brokers. However, Underwriter and the brokers do not have to be clients in order for Class Counsel to have a conflict of interest. It is sufficient to establish a conflict of interest that Class Counsel's independence of professional judgment as well as counsel's relationship with his potential clients were affected by the funding and the "implicit understanding" that resulted.

It is significant to note that the financial arrangements and the corresponding "understanding" were reached before a single representative of the class was identified. This arrangement was not made after consultation with any "client," but was made solely by Class Counsel with the Underwriter and the brokers and was a precondition to any subsequent attorney-client relationship between class counsel and the class representatives.

---

**6.** Rule 4–1.6(a) states, "A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation...."

This is particularly troublesome in two respects. First, Class Counsel acknowledges that he did not investigate or consider the potential claims that might have been asserted against Underwriter and/or the brokers. Thus, it is impossible for Class Counsel to ascertain or to adequately consult with his subsequently acquired clients whether the amount of the financial and other assistance was appropriate consideration for not filing claims against Underwriter and/or the brokers in the class lawsuit.

Second, the timing of the arrangement makes absolutely clear that it is Class Counsel and Underwriter and the brokers, not the class representatives, that are controlling the lawsuit in fact. They, not the class representatives, have determined the manner in which the dispute is being litigated: who pays the class fees and expenses and who is and who is not sued. This shift in the control of the lawsuit is inappropriate in any situation, but especially in a class action context. *See In re Mid–Atlantic Toyota Antitrust Litigation,* 93 F.R.D. 485, 490 (D.C.Md.1982).

It should be acknowledged that to some extent this type of problem is inherent in all class action lawsuits. There is often a wide disparity between the financial interests of the individual clients and the financial interests of class counsel. A class-member client's individual claim may be worth $50 or $5,000. The lawyer, who has advanced many thousands of dollars in litigation expenses, however, may hope for compensation in the millions.[7] In such situations, the lawyer's own interests may greatly exceed those of any claimant. 7A Wright, Miller & Kane, *Federal Practice* sec. 1769.1 (Civil 2nd ed.1986). That is why Rule 52.08 gives overall responsibility to the trial judge to protect the members of the class. "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." 4 Herbert Newberg & Alba Conte, *Newberg on Class Actions* sec. 13:20 (4th ed.2002).[8]

---

7. "[S]ome courts have noted that a class attorney's agreement to advance the expenses of the litigation may present an ethical problem that should be considered in evaluating the adequacy of the representation ... [A]ny conduct that suggests that class counsel may have been engaging in unethical behavior is relevant in determining the adequacy of the representation.... [S]ome courts have authorized discovery by the opposing party to determine whether class counsel's behavior satisfies all ethical standards." Wright, Miller · & Kate, *Federal Practice and Procedure: Civil 2nd* sec. 1769.1. *See also, Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

8. The pertinent provisions of Rule 52.08 are:
 (c) Determination by Order Whether Class Action to be Maintained–Notice–Judgment–Actions Conducted Partially as Class Actions.
 (1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained *(includes determination of adequate representation required by 52.08(a)(4))*
 . . . .
 (d) Orders in Conduct of Actions. In the conduct of actions to which this Rule applies, the court may make appropriate orders:
 . . . .
 (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action;
 . . . .
 (e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or

Because of the trial judge's responsibility, class actions are different. In individual actions the client is entitled to make decisions as to the course of the litigation including the terms of settlement. In a class action, by contrast, this is not so simple. In a class action what is protected is not primarily the autonomy of the client and the client's right to control the lawsuit, but the interests of the clients as a class. These lawsuits are designed to vindicate the rights of a class of persons; they are rarely driven by the particular motivations of an individual client. *See id.* at sec. 3:40.

### 4. Consultation and consent cannot cure Class Counsel's conflict

 Class counsel and the trial judge are shown, on this record, to have been acutely aware of the ethical issues posed in this litigation. They believed that the potential conflicts could be resolved by a full disclosure in the notice to the class. It is likely that this decision was influenced by a desire to allow the class an opportunity to pursue claims against the present named defendants that might otherwise have been lost. Disclosure and notice are an insufficient cure, however, for the following reasons.

First, our rules do not allow for this type of conflict to be cured by consultation and consent. Rule 4–1.7(b)(1) only allows for consultation and consent if "the lawyer reasonably believes the representation will not be adversely affected." Rule 4–1.8(f)(2) only allows for consultation and consent if "there is no interference with the lawyer's independence of professional judgment." Here, the attorney structured the situation where he could not consider bringing suit against certain potential defendants because they fronted the attorney

fees and expenses for the suit to be brought only against others. The conflict, *per se*, interferes with the lawyer's judgment and must be reasonably judged as adverse.

 Second, in a class action, consultation and consent concerning any serious conflict is extremely difficult, if not impossible, to obtain. In Missouri, in order for informed consent to be valid, a lawyer "must prove by clear proof that his adverse interest was disclosed to the client and was perfectly understood." *In re Weier,* 994 S.W.2d 554, 558 (Mo. banc 1999). In order to waive the conflict, each class member would have to give "knowing, intelligent, and voluntary" consent. *In re Schaeffer,* 824 S.W.2d 1, 3 (Mo. banc 1992). This would require Class Counsel to fully disclose the conflict of interest to each individual member of the class. Given that there are approximately 650 potential members of this class, this is simply impracticable. "[I]t is unrealistic to speak of individual consultation with large numbers of class members and unrealistic to imagine that each client could give truly informed consent." Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* sec. 11.12 (3d ed. Supp.2004); *see Palumbo v. Tele–Communications, Inc.,* 157 F.R.D. 129, 133 (D.D.C.1994) (unidentified class members cannot waive a potential conflict of interest); *In re Mid–Atl. Toyota Antitrust Litig.,* 93 F.R.D. 485, 491 (D.Md.1982) (full disclosure and consent would be extremely difficult to obtain in a class action should a conflict of interest present itself); *Chateau de Ville Productions, Inc. v. Tams–Witmark,* 474 F.Supp. 223, 227 (S.D.N.Y.1979) (when a conflict of interest arises involving class counsel, consent of all of the members of the class is

compromise shall be given to all members of the class in such manner as the court

directs.

required, which is not a practical possibility). The "class notice" remedy contemplated by Class Counsel and the trial court is inadequate to fulfill this duty.[9]

Third, Class Counsel's contemplated remedy of a possible separate suit against Underwriter and/or the brokers by other attorneys is inadequate and antithetical to the concept of class action litigation. It is uncertain if any such suit would actually be filed. If it were, it would require the very same duplicative fees and expenses to all parties that class actions are designed to avoid. In addition, the inevitable third party claims among defendants, already initiated in this action, preclude such a strategy from working.

Finally, the present scheme has an unavoidable appearance of impropriety that cannot be sanctioned. A potential defendant fronting fees and expenses to direct a class action lawsuit only against other defendants, before a class representative has even been identified, smacks of a defense strategy, not the independent prosecution of the interests of the plaintiff class. It is obvious that the action is being controlled by Underwriter, the brokers, and Class Counsel, not by the class. *See In re Mid–Atl. Toyota Antitrust Litig.*, 93 F.R.D. at 490. To allow the lawsuit to proceed in this posture would invite a situation where the culpability of Underwriter and the brokers, if any, would be borne by the other defendants paying too much or by the Plaintiffs receiving too little.

The Underwriter and the brokers may have no liability. They also may be acting in subjective good faith, attempting to see that all of the bondholders are made whole. But, they cannot be allowed to avoid their own responsibility, if any, merely by funding and causing a class action lawsuit to be filed against others.

## 5. The trial court's duty to protect the absent class members

 The court has an enhanced duty in class action proceedings to safeguard the interests of the class members who did not participate in the formation of the class. "It must be remembered … that what the court is primarily concerned with here is not the interests of the named plaintiffs and their attorneys but the interests of the members of the class." *Kronenberg v. Hotel Governor Clinton, Inc.*, 281 F.Supp. 622, 625–26 (S.D.N.Y.1967). The court must therefore "constantly scrutinize the class attorney to see that he is adequately protecting the interests of the class." *North Am. Acceptance Corp. Sec. Cases v. Arnall*, 593 F.2d 642, 645 (5th Cir.1979).

> In assessing the ability of the plaintiffs' counsel to carry out his fiduciary duties to absent class members we think the court should use its broad administrative, as well as adjudicative power, as guardian of the rights of the absentees to see that the absentees are represented by counsel who is ethically as well as intellectually competent to represent them.

*Stavrides v. Mellon Nat'l Bank & Trust Co.*, 60 F.R.D. 634, 637 (W.D.Pa.1973) (internal quotations omitted). The court also has a duty to the defendants in a class action proceeding to ensure that the litigation will comply with due process and achieve a final binding resolution of the dispute. *See Am. Family Mut. Ins. Co. v. Clark*, 106 S.W.3d 483, 495–96 (Mo. banc 2003) (Wolff, J., concurring).

## 6. Class certification

Often, when class counsel or the named representatives have a conflict of interest

---

**9.** Class Counsel's engagement letters reveal the obvious inadequacy of "assuming" consent.

or have engaged in conduct prohibited by our rules, courts have either refused to certify or have de-certified the class.[10] While decertification is a possible remedy, the trial court determined that the case could be most appropriately litigated on a class basis. This determination was not an abuse of discretion. In fact, the claims of 650 similarly situated investors against the sellers and administrators of these bonds are precisely the types of claims that class proceedings were designed to resolve justly and efficiently. Nonetheless, an appropriate and effective remedy must be adopted for this matter to proceed as a class action.

### 7. Possible remedies

The trial court has a broad range of discretion in which to craft a remedy that will protect the class and the defendants in the action, and that will preserve the integrity and efficiency of class procedures.

If allegedly unethical conduct by a named plaintiff or class counsel is shown to be prejudicial to class members or otherwise results in irreconcilable conflicts of interest, many courts have ruled that a class that otherwise meets the requirements of Rule 23 should not be denied class status for ethical considerations. Instead, courts have used corrective measures such as substitution of counsel or the named plaintiff and remedial notice to class members to avoid delay in reaching the merits and prejudicing plaintiff's rights.

5 Herbert Newberg & Alba Conte, *Newberg on Class Actions* sec. 15:1 (4th ed.2002) (internal quotations omitted).[11]

**10.** *Key v. Gillette Co.*, 782 F.2d 5, 7 (1st Cir. 1986) (class decertified due to unethical performance by class counsel); *Irvin E. Schermer Trust, by Kline v. Sun Equities Corp.*, 116 F.R.D. 332, 338 (D.Minn.1987) (certification correctly denied due to class counsel's conflict of interest); *Kuenz v. Goodyear Tire and Rubber Co.*, 104 F.R.D. 474, 477 (E.D.Mo. 1985) (if representatives' interests will be antagonistic to the class's interests, the prerequisite of Rule 52.08(a) is not met and class certification will be denied); *Dirs. Guild of Am., Inc. v. Warner Bros., Inc.*, 2 Fed. R. Serv.3d 1429 (C.D.C.1985) (certification denied due to inadequacy of class representatives); *In re Mid–Atlantic Toyota Antitrust Litig.*, 93 F.R.D. 485, 491 (D.Md.1982) (court denied certification due to unethical fee arrangement between class counsel and named plaintiffs); *In re Commonwealth Oil/Tesoro Petroleum Sec. Litig.*, 484 F.Supp. 253, 265 (W.D.Tex.1979) (because class had ceded control to class counsel, and class counsel may have conflicts of interest, class certification denied); *Charal v. Andes*, 81 F.R.D. 99, 102 (E.D.Pa.1979) (where class representatives had conflicts of interest, certification denied); *Conway v. City of Kenosha*, 409 F.Supp. 344, 349 (E.D.Wis.1975) (certification denied for, *inter alia*, class counsels' conflicts); *Stavrides v. Mellon Nat'l Bank & Trust Co.*, 60 F.R.D. 634, 636 (W.D.Pa.1973) (class action status should be denied where counsel's unethical conduct has been or is prejudicial to the interests of the class, or results in creating a conflict of interest between the attorney and the class); *Taub v. Glickman*, 1970 WL 210, *1, 14 Fed. R. Serv.2d (West) 847 (S.D.N.Y.1970) (class status denied due to class counsels' inability to adequately represent the class); *Korn v. Franchard*, 1970 WL 3481, *5, Fed. Sec. L. Rep. (CCH) P 92,845 (S.D.N.Y.1970) (class status denied, in part, due to attorney misconduct).

**11.** *See also Palumbo v. Tele–Communications, Inc.*, 157 F.R.D. 129, 133 (D.D.C.1994) (class counsel disqualified pre-certification, plaintiffs given sixty days to substitute counsel prior to court ruling on certification); *Hawkins v. Holiday Inns, Inc.*, 1979 WL 1750, *14 (W.D.Tenn.1979) (counsel was ordered disqualified due to conflicts of interest, but class was not decertified nor was case dismissed); *Lowenschuss v. C.G. Bluhdorn*, 78 F.R.D. 675, 678 (S.D.N.Y.1978), *affm'd on appeal in Lowenschuss v. C.G. Bluhdorn*, 613 F.2d 18 (2nd Cir.1980) (class counsel who served also as class representative was disqualified and ordered to send notice to all members of class

■ Disqualification of class counsel in such circumstances can protect the integrity of the litigation process without frustrating the plaintiffs' opportunity to seek justice. "Only the most egregious misconduct on the part of plaintiffs' lawyer could ever arguably justify denial of class status." *Halverson v. Convenient Food Mart, Inc.*, 458 F.2d 927, 932 (7th Cir. 1972). "The better disposition should be to substitute counsel to avoid unduly delaying reaching the merits and prejudicing the plaintiffs' rights." *In re Nissan Motor Corp. Antitrust Litig.*, 1975 WL 166141, *3, 22 Fed. R. Serv.2d (West) 63 (S.D.Fla. 1975).

Remedies short of complete disqualification *might* also be appropriate.[12] For example, it might be determined that existing counsel may continue to represent certain individual parties or certain subclasses in the litigation or there might be an appropriate role for existing counsel relative to the entire class. However, at the very least, new counsel must be retained to investigate, evaluate, and, if appropriate, prosecute class claims against Underwriter and/or the brokers.[13]

### 8. Class representatives and potential conflicts

In addition to Class Counsel's potential conflicts of interest, Relators have alleged that at least two of the named class representatives also have conflicts of interest that could make them inadequate representatives of the class.

First, Relators allege that Donald R. Glaser is an inadequate class representative due to his personal relationship with one of the brokers. Relators note that Glaser purchased his bonds from his son, William Glaser, who is one of the brokers who initially hired Class Counsel and is part of the group of brokers that Class Counsel agreed not to sue.

Second, Relators allege that Rona Hodes is an inadequate class representative due to her relationship with Underwriter. Hodes had a Series 6 NASD license that was held by Underwriter, was employed by Underwriter as a registered representative and broker during the period at issue in the lawsuit, and is part of the group of brokers that Greiman agreed not to sue. Relators further allege that Hodes bought the bonds while she was a broker at J.E. Liss & Co., and that she received commissions from the sale of those bonds. In addition, they allege she served on the creditors committee for the SLLC bankruptcy.

Relators allege that these two are inadequate representatives of the class because their personal ties to the people Class Counsel agreed not to sue make their interests antagonistic to the interests of the class. *Davis v. Comed, Inc.*, 619 F.2d 588, 593–94 (6th Cir.1980) (class representatives must be free of any interest which holds the potential of influencing their conduct of the litigation in a manner inconsistent with the interests of the class). The trial court should examine the appropriate-

seeking a substitute representative; once a new class representative was certified, then the court would grant the motion to disqualify class counsel); *Hawk Indus., Inc. v. Bausch & Lomb, Inc.*, 59 F.R.D. 619, 624 (S.D.N.Y. 1973) (where co-counsel was found to have conflict of interest, class was nonetheless certified because co-lead counsel had no such conflict and could therefore adequately represent the class).

**12.** The Court does not pre-approve any particular remedy.

**13.** "[P]laintiffs are free to seek different counsel and thereby dispel any possibility of a conflict of interest." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 96 (7th Cir.1977).

ness of these individuals serving as class representatives. *See Tedesco v. Mishkin,* 689 F.Supp. 1327, 1337–39 (S.D.N.Y.1988) (one named class representative was removed, but class was allowed to continue); *Runion v. U.S. Shelter,* 98 F.R.D. 313, 318 (D.S.C.1983) (in pre-certification context, court removed inadequate representative but allowed class to pursue certification).

## IV.

Defendants sought only decertification below. The parties have not explored alternative remedies that are less harsh. This can best be done at the trial court. Only if another appropriate remedy can not be found must the class be decertified.

The writ is made absolute as modified.

WOLFF, LAURA DENVIR STITH, and LIMBAUGH, JJ., concur.

TEITELMAN, J., dissents in separate opinion filed; WHITE, C.J., concurs in opinion of TEITELMAN, J.

RICHARD B. TEITELMAN, Judge, dissenting.

I respectfully dissent.

Relators seek a writ of prohibition. "Prohibition is a discretionary writ, and there is no right to have the writ issued. Prohibition will lie only to prevent an abuse of judicial discretion, to avoid irreparable harm to a party, or to prevent exercise of extra-jurisdictional power." *State ex rel. Linthicum v. Calvin,* 57 S.W.3d 855, 856–57 (Mo. banc 2001) (citations omitted). Interlocutory review of trial court error by writ of prohibition "should occur only in extraordinary circumstances." *State ex rel. Chassaing v. Mummert,* 887 S.W.2d 573, 577 (Mo. banc 1994). "If the error is one of law, and reviewable on appeal, a writ of prohibition is not appropriate." *Id.*

Missouri's trial judges are steeped in a tradition of justice and discretion. They do not make class certification rulings arbitrarily. In this case, the trial judge exhibited a great deal of careful discretion. As the principal opinion acknowledges, the trial court certified the class "[a]fter extensive discovery and three evidentiary hearings." The trial court heard oral argument and considered lengthy briefs submitted by fine attorneys from reputable law firms. The trial court concluded that the class would be certified with appropriate protections for the class members. The trial court decided that full disclosure in the notice to the class members and freedom to opt out of the class were sufficient remedies for the problems discussed by the principal opinion. A decision as to what remedy is appropriate is a difficult one-and one appropriately left within the discretion of the trial court. The notice to class members is yet to be drafted or issued. This Court is not yet reviewing a full record. The plaintiffs may win or lose depending on a variety of factors that may or may not be related to class counsel or representatives, but that result is far from clear at this early stage.

"The trial court abuses discretion if its order is clearly against the logic of the circumstances, is arbitrary and unreasonable, and indicates a lack of careful consideration." *State ex rel. Ford Motor v. Messina,* 71 S.W.3d 602, 607 (Mo. banc 2002). This is far from such a case. There is no compelling reason why these issues cannot be raised on direct appeal with a great deal more clarity.

I would quash the writ.